617 So.2d 484 (1992)
STATE of Louisiana
v.
Steven B. QUATREVINGT.
No. 90-KA-1169.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1992.
Rehearing Denied May 12, 1993.
*486 Harry F. Connick, Dist. Atty., Charmagne Padua and Mark D. Pethke, Asst. Dist. Attys., New Orleans, for plaintiff-appellee, State.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant-appellant, Steven B. Quatrevingt.
Before KLEES, PLOTKIN and LANDRIEU, JJ.
KLEES, Judge.
On June 13, 1988, defendant, Steven B. Quatrevingt, was charged by a bill of information with first degree murder, allegedly committed in the perpetration of an aggravated rape, in violation of Louisiana Revised Statute, 14:30, subd. A(1). On March 28, 1989, the trial court convened a lunacy hearing and adjudged the defendant competent to stand trial.[1] After numerous delays, on April 14, 1989, defendant's Motion to Suppress Evidence was heard and denied. On January 19, 1990, at the conclusion of twelve days of trial, the jury found the defendant to be guilty of first degree murder. The jury, however, was deadlocked on the penalty to be imposed. Thereafter, on March 9, 1990, the defendant appeared with counsel for sentencing. At that time, counsel for defendant filed a Motion for New Trial or Motion for Post Conviction Judgment of Acquittal. Both motions were denied, and the defendant was consequently sentenced to serve a life sentence. Although his oral motion for appeal was filed on that date, and his record was lodged in this court on July 2, 1990, supplementation was not completed until May 13, 1991. The defendant's original pro se brief was filed on June 17, 1991, counsel's brief was filed on July 26th, and the State's brief was filed on August 15th. Thereafter, the defendant, pro se, filed a Motion to Remand for Hearing on Motion *487 for New Trial. The case was ordered remanded; and on February 21, 1992, the district court denied defendant's Motion for New Trial. On May 19, 1992, the defendant filed a supplemental pro se brief, superseding his original pro se brief which was filed June 17, 1991.

STATEMENT OF THE FACTS
Testimony at trial established that the victim and her parents lived at the Mark VII Apartments, located at 4508 Papania Drive in New Orleans, Louisiana, and that defendant, Stephen Quatrevingt, was employed by Mark VII as maintenance man for the apartment complex. According to the parents, the victim was a mentally-handicapped,[2] twenty-two (22) year old who performed daily household chores for her parents while they were operating a family restaurant catering business. It was the practice of the parents to wake the victim in the morning so that she could chain the door after they were gone.
At or about ten o'clock on the morning of June 13, 1988, the victim's mother spoke with her on the telephone. At that time, the victim informed her mother that she was going for a bicycle ride later in the day. State's witness, Wendy Robin, testified that she observed the victim outside of her apartment around noon. Also, Freddie Jean Deboss, the manager of the apartment complex, testified that he spoke with the victim around noon when she complained that the electricity in her apartment was off. At that time, Quatrevingt accompanied the victim to her apartment to determine the cause of the electrical problem. Returning at or about 12:35, Quatrevingt informed Ms. Deboss that the main breaker was merely turned off. Eight year old Gerald Dorsey further testified that, while riding his bike in front of the victim's apartment, he observed Quatrevingt and the victim walking towards the victim's apartment, and that he heard loud noises emanating from the apartment "like jamming on the walls." Gerald Dorsey stated that he did not see the victim later in the day.
At or about 5:00 p.m., the parents returned home, and the father remarked that, although the door was locked, the door's chain was unlatched. Entering the apartment, the parents observed their daughter's disrobed body near the door, her face covered with a white towel. Lifting the towel, the mother saw a blue cast on the victim's face, dried blood under her eyes, and something around her neck. At that point, the parents attempted to call the police; however, the phone was off the hook. Eventually, the police were called regarding the murder.
Detective Steven Nicholas ("Nicholas") of the Homicide Division of the New Orleans Police Department arrived on the scene to direct the investigation in the preliminary phase. Upon entering the apartment, Nicholas observed that the victim was nude from above the breasts, that her legs were partially spread, that her eyes were partially open, and that a telephone cord, leading from a kitchen receptacle, was roped around the victim's neck.
Testifying that the physical evidence revealed no sign of forced entry[3], Detective Nicholas believed that the victim knew her assailant. Coroner Paul McGarry testified that he examined the victim's body and determined the time of death to be between 12:00 and 12:30 p.m. that day. According to Dr. McGarry, her face was dark purple and had hemorrhages in the skin and in the eyes. Around the victim's neck were three wraps of a robe sash, tightly tied in two double knots under the victim's chin; beneath the sash, Dr. McGarry found a telephone cord wrapped three times around the neck, indenting the skin. The bruising on her throat revealed that the victim was first strangled by hands. Although her genital area was intact, revealing no trauma to the vagina, the victim's rectum had been dilated to more than one inch, causing eight tears in the rectal tissue. Smeared fecal matter was observed along the periphery *488 of the rectum, along with what appeared to be seminal fluid. After moving the body slightly, a small piece of rubber-like black material was retrieved from underneath the victim's right thigh.
On the same day, Quatrevingt was questioned by Detective Nicholas on the scene. According to Nicholas, Quatrevingt was advised that he was under investigation for the murder of the victim, and informed of his rights. During the interview, Quatrevingt stated that he had gone to the apartment with the victim, and explained that, as he was leaving the victim's apartment, he tripped over the telephone cord.[4] However, the victim was fine when he departed. Being suspicious of Quatrevingt's knowledge of certain details of the crime, a search warrant was obtained to seize his shoes and clothing. At approximately 3:00 a.m., on June 14, 1988, Quatrevingt was brought to Charity Hospital where samples of his hair, blood and saliva, were taken and a penile swab performed.[5] Thereafter, all of the samples taken from Quatrevingt were sent to various laboratories for analysis.
At trial, testimony was received from New Orleans Police Department criminologist, Edgar Dunn, who stated that the bermuda shorts taken from Quatrevingt tested positive for both semen and fecal matter. Also, the penile swabs of Quatrevingt further revealed the presence of fecal matter. Further evidence consisted of a match between Quatrevingt's shoe sole and a print found outside the victim's apartment, as well as the fact that the piece of rubber found under the victim matched a gouge in the bottom of Quatrevingt's shoe.[6]
Additionally, several doctors and technicians testified, despite defense objections, that the DNA testing revealed that the seminal fluid found on the towel near the victim's leg "matched" the DNA imprint of Quatrevingt.[7]
In response, the defense presented evidence that other suspicious males were in the area at the time of the rape/murder: Specifically, the state received a call from a woman who identified another individual as the murderer. Regarding the DNA testing, the defense offered Dr. James Cohen. Dr. Cohen stated that, although the methods of DNA testing fell well within the bounds of accepted protocol in the scientific community, the testing done in this matter did not adequately control for an occurrence known as "bandshifting." According to Dr. Cohen, the "match" referred to by the State was only obtained after adjusting for the "bandshifting."

Errors Patent
A review of the record for errors patent reveals that the trial court failed to wait twenty-four hours to sentence the defendant after denying his post-verdict judgment of acquittal and new trial. La.C.Cr. P., art. 873. A review of the record does not indicate that the defendant waived this delay; thus, it is an error patent on the face of the record.
However, in State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991), this court held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. As no error was raised as to the defendant's sentence, the failure of the trial court to observe the delay period is harmless error.

*489 Assignments of Error

I.
As his first assignment of error, the defendant argues that the trial judge erred in failing to grant challenges for cause as to prospective jurors Nos. 337 and 324 based on the fact that these jurors exhibited bias and were never rehabilitated. According to the defendant, juror 324, Deborah A. Smith, and juror 337, Martin A. Straka, revealed, during the voir dire examination, preconceived views on Fifth Amendment rights.
Since Mr. Straka was dismissed as a juror by the exercise of a peremptory challenge by the State, the issue of bias, as it related to Mr. Straka, is moot. As to Ms. Smith, the defense objected to the selection of Ms. Smith based on her response to defense questioning[8] that she "would prefer that [Steven Quatrevingt] took the stand," and "would want him to take the stand." However, the Louisiana Supreme Court has held that such questioning is irrelevant.
In State v. Knight, 296 So.2d 800 (La. 1974), the trial judge sustained the State's objection to defense counsel's question of whether the venireman would want the defendant to testify in that matter. On appeal to the Supreme Court, the defendant complained that the trial court committed reversible error in refusing to permit such questioning. The Court disagreed, holding that:
[T]he question posed by defense counsel is of the type which is commonly referred to as being "loaded." If the juror replies affirmatively he has indicated that he desires the defendant to take the stand. A negative reply might infer that he would disregard the defendant's evidence. An answer to the question would provide no information helpful in deciding whether to challenge the juror. Id. at 801 (emphasis added).
In the instant case, the defense was permitted to ask a similarly "loaded" question to Ms. Smith. However, after having stated her preference that the defendant testify, Ms. Smith also stated that she understood that the court would instruct her that the defendant was not required to do so. Certainly, the defense cannot transform Ms. Smith's preference that the defendant take the stand into her complete inability and unwillingness to accept the court's instructions on matters of law. Undoubtedly, for these reasons, the Supreme Court of Louisiana has stated that such questions are irrelevant.[9]
This assignment is without merit.

II.
In his second assignment of error, the defendant maintains that the trial court erred in allowing evidence of DNA testing to be introduced at trial. Seeking to block the admission of the DNA evidence, defense counsel filed an evidentiary motion for hearing.[10] However, the trial court determined that the admissibility of the DNA evidence would be resolved under Louisiana Evidence Code, Article 704 and stated that: "before I let any evidence in the case, I'm going to let them have an opportunity to put that in, to have a hearing as to whether or not it's admissible."
*490 As the State correctly pointed out at trial, Louisiana Revised Statute, 15:441.1 explicitly speaks to this issue of the relevance of DNA testing:[11]
Evidence of deoxyribonucleic acid profiles, genetic markers of the blood, and secretor status of the saliva offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence. (emphasis added)
Clearly, the Louisiana legislature determined that evidence regarding DNA testing is relevant per se to a criminal inquiry. As such evidence is relevant, its admissibility is governed by Article 402 of the Evidence Code, which provides:
[A]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.
Despite these express statutory and codal provisions, the trial court declined to consider and apply LSA-R.S. 15:441.1 as a per se rule of admissibility of DNA evidence without a pre-trial hearing. Instead, the court required that a hearing be held on the "reliability of DNA evidence." After receiving expert testimony regarding the methodology and the evaluation of DNA testing from molecular geneticist, Dr. James Malter of Tulane University, and Dr. Kevin McElfresh of Lifecodes Laboratory, a molecular and population geneticist, the trial court ruled the DNA evidence to be admissible. We find no error in his ruling.[12]
By way of his supplemental brief, the appellant pro se adds more arguments to the claim that this evidence should not have been admitted: (1) the State withheld test results and reports dealing with the DNA evidence until well into the trial; (2) the State's witnesses offered unsupported opinions and contradictory testimony; (3) there was a lack of quality controls; and (4) the probative value of the results was greatly outweighed by the prejudice to the defendant in that the evidence concerning DNA was misleading and confusing.
With respect to the first claim, it is true that the defense was not afforded certain reports until after the start of trial. However, the defense did not object to the introduction of any evidence due to the lateness of its discovery. As such, the defendant cannot now make this complaint on appeal. See C.Cr.P. art. 841. In addition, it appears that the defense was eventually presented with all information it sought and had adequate time to examine this information. On January 8, 1990, just prior to the start of trial, the trial court was told that some information requested shortly before trial was to begin had not been supplied to the defense. The court ordered that the remaining reports be sent by Federal Express to the court, with the proviso that the court would stop the trial if necessary to give the defense time to evaluate the newly-received information. On January 9th, the defense received a package from Lifecodes, the company which conducted the DNA analysis for the State, and at that time Dr. Cohen, the defense expert, admitted that he had previously stated on August 17, 1989, that the defense had received all the information that was needed, and then he requested further information on November 29, 1989, which was received on December 4, 1989. Apparently, just prior to trial more information was requested by the defense.
On January 10th, during testimony out of the jury's presence by Dr. McElfresh from Lifecodes, it was discovered that one of the autorads had been incorrectly *491 marked and the autorad of one of the probes used by Lifecodes to come to its conclusions had not been given to the defense. That autorad, along with another one which had yielded no results, was given to the defense at that point. Dr. Cohen indicated that he would need two and a half to three hours to study the newly discovered evidence and court was adjourned for the day. A week later, when Dr. Jazwinski, another defense witness, testified, he admitted that the trial court gave the defense as much time as it needed to review the materials and he indicated that he was given enough time to review all evidence supplied by Lifecodes.
The main piece of evidence which the appellant contends was withheld was the protocol of Lifecodes, which set forth the procedures and materials used by Lifecodes in its analysis. The defendant argues that this protocol was not supplied to the defense until after the State's witnesses had left town, thereby defeating his right to cross-examine them on the procedures actually used. However, it appears that this protocol was presented to the defense some time prior to trial, but Dr. Cohen refused to accept it because he would have had to sign some sort of copyright agreement in order to see it which would have hampered him in his own DNA business. In addition, Dr. Cohen admitted that he was quite familiar with most of the information contained in the protocol. Lastly, although the actual protocol was not in the possession of the defense during the cross-examination of Dr. McElfresh and Ms. Vining (who conducted the tests), a reading of their testimony shows that they were exhaustively cross-examined on both the recommended procedures to be used and the procedures actually used in the testing. This claim is without merit.
By his second part of this assignment, the defendant argues that the DNA evidence should not have been introduced because it was based on unsupported opinions and contradictory testimony. Ms. Vining, the person who actually ran the tests, testified that Lifecodes was supplied with four samples to be tested: (1) a vial of the defendant's blood; (2) a glass jar containing a dried, semen-like material which had been scraped from the victim's leg; (3) semen stains on the towel found near the victim's leg; and (4) a vial of the victim's blood. Exhibits S-60 through S-63 were the autorads of four probes which were run on these samples.
The defendant first argues that Ms. Vining's opinion that there was a match between the semen found on the towel and the defendant's blood was not supported by the evidence because she testified that in the upper genetic system of S-60 there was one DNA marker for defendant's blood and none for the semen found on the towel. He notes that she attributed this lack of marker with respect to the semen taken from the towel to deterioration of the semen sample. Defendant then notes that Ms. Vining later testified that semen could be tested several months to a year later. He concludes that because there was no marker in the upper genetic range of S-60 for the sample taken from the towel, then there could not have been any semen in the towel, and Ms. Vining incorrectly testified that there was a match between the semen in the towel and his blood.
However, a reading of Ms. Vining's testimony shows that she testified: "Once a sperm is collected and dried it could beit could be tested for several months, maybe a year or so." Here, the semen was not actually collected until Ms. Vining started her test procedures on it, which was some time after the towel was seized. Thus, the sample on the towel could very well have deteriorated somewhat. Even more compelling, Ms. Vining testified that although there was no DNA marker for the semen from the towel in the upper genetic system, three bands were observed in the lower system from both the defendant's blood and the semen from the towel, and it was upon these bands that match was made.
The defendant also argues that the test results were unreliable because they exceeded the standard deviation set forth by Lifecodes. In support, he cites Exhibit S-71/D-15, which lists the percentage of deviation in the bands in Exhibits S-60 and *492 S-61, two of which exceed the two percent deviation cutoff used by Lifecodes. Ms. Vining testified that the probe used in S-61 was D17S79, while one of the two probes used in S-60 was DXYS14. S-71/D-15 shows that for probe D17S79, the percentage of difference in the bands was 2.18. Three percentages are shown for probe DXYS14: 2.50, 1.53, and 1.68. The defendant concludes that because only two of these deviations was within the limits set by Lifecodes, the conclusion reached by Ms. Vining, that there was a match between the defendant's blood and the semen taken from the towel, was unfounded.[13] However, it must be noted that two of the three percentages for probe DXYS14, shown in exhibit S-60, fell below the deviation limit. Thus, Ms. Vining's conclusions were supported by the evidence. The jury was made aware fully of these percentages of deviation, and it was able to make its own determination of credibility, which this court may not disturb unless such finding is clearly contrary to the evidence. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989). This claim has no merit.
The defendant next contends that the results of the DNA tests should have been suppressed because of what he terms a lack of quality controls at Lifecodes. In support, he cites the misidentification of one of the autorads given to the defense. It is true that Lifecodes misidentified an autorad which was presented to the defense; instead of giving the defense the "X-probe" autorad, which was used to compare and match the semen taken from the towel with the defendant's blood, Lifecodes instead gave them an autorad of a "Y-probe" which was used for a different purpose, to show the presence of human DNA. However, this mistake, which was rectified in time for the defense to review the correct autorad, should not render all evidence from Lifecodes inadmissible.
The defendant also contends that Lifecodes' quality controls were inadequate because Ms. Vining's "failed" to testify as to the method she used to test the sample taken from the victim's leg. However, a reading of Ms. Vining's testimony shows that she made some reference during direct examination to the preparation of this sample when she testified that she "treated that in the same manner as I described for the bloods." Prior to making this statement, she had testified as to the method she used to extract the DNA from the defendant's and the victim's blood samples. Later, during direct examination, she testified that she added liquid to the jar and rinsed it "to try and remove the semen-like substance that was allegedly in the jar and then processed that liquid for any sort of cellular material." During cross-examination, she was not specifically asked how she processed this sample, but instead was only asked questions about how the sample looked when she first opened the jar and how the inside of the jar looked on the day of trial. This claim has no merit.
The defendant lastly argues that the DNA evidence should have been suppressed because of what he calls the "inconclusiveness" of the final result. He argues that Dr. McElfresh testified that the match found between the defendant's blood and the semen from the towel had appeared in one out of 1205 tests of the caucasian population of the Lifecodes database. Defendant argues that it was not proven that the crime was committed by a caucasian and Lifecodes gave no evidence of the frequency of this match with any other racial group. He argues that this last omission is especially important due to the fact that over half of the population of New Orleans is non-caucasian, and the final result thus did not exclude many other potential perpetrators who were non-caucasian. However, during Dr. McElfresh's testimony, the jury was made aware that these statistics applied to only the Lifecodes' caucasian database. In addition, the defense was given the opportunity to cross-examine Dr. McElfresh on this point and apparently chose not to do so. This claim has no merit.

*493 III.
Thirdly, the defendant maintains that he is entitled to a mistrial, based on the admission into evidence of an alleged prior incident involving the defendant. Specifically, he argues that the error was committed when the victim's mother was allowed to testify that the victim had told her that, approximately one month prior to the murder, the victim had awakened to find the defendant sitting on the side of her bed, and that the defendant explained that he was there to repair the air conditioning unit.
Subsequent to the admission of this testimony, defense counsel requested a mistrial, stating:
Judge, at this time we'd like to urgefile a Motion for a Mistrial based upon the hearsay statements of the victim's mother in this case. She has testified as to a statement made to her by her daughter prior to the actual murder in this case, and we are alleging that although this may be relevant, the evidence should be excluded because of it's [sic] probative value is substantially oldoutweighed the granger [sic] of unfair justice to my client, in that it confuses and may attempt to mislead the jury. This case is a case of circumstantial evidence, and this particular issue being testified to by the mother in this case is clearly prejudicial. (Tr. 93, lines 28-31; Tr. 92, lines 1-11) (emphasis added)
In response, the prosecution argued that such testimony was highly relevant to show that: (1) the defendant had full access to the apartment; and (2) there was no forced entry. Over the defendant's hearsay objection, the Motion for Mistrial was denied.
Thereafter, the victim's father also testified that he had been informed that the defendant had let himself into the parent's apartment and that the victim "awoke while he was in her room and it startled her and it frightened her." Again, the defense lodged its objection to the testimony "under 403, as being hearsay."
Despite these hearsay objections at the time of trial, on appeal, the defendant now asserts that "[T]he testimony which the state elicited was unnecessary and unduly prejudicial, smacking even of other crimes evidencethe unauthorized entry of the apartment. As such it mandates a mistrial under La.C.Cr.P. art. 770."
It is, however, unnecessary for this court to inquire whether a mistrial was mandated pursuant to Louisiana C.Cr.P. art. 770, because at the time of trial, the defendant lodged an exception based on hearsay, not on prior crimes. Thus, an objection based on prior crimes would be considered a new basis for objecting to the testimony in question.
It is well-established in Louisiana jurisprudence that a new ground of objection may not be presented for the first time on appeal. La.C.Cr.P. art. 841; State v. Burdgess, 434 So.2d 1062 (La.1983); State v. Sims, 426 So.2d 148 (La.1983); State v. West, 419 So.2d 868 (La.1982); State v. Berryhill, 562 So.2d 1105 (La.App. 4th Cir. 1990). As this defendant is limited on appeal to objections made at trial, this new basis for the objection should be rejected. This assignment is meritless.
In his pro se brief, the defendant contends that this evidence should not have been introduced because it was impermissible hearsaythe original objection made at trial. A review of the hearsay articles of the Code of Evidence, arts. 801 through 806, reveals that the defendant is correct. Because the victim's statement does not fall within any exceptions to art. 802, it was inadmissible hearsay, and the trial court erred by allowing its introduction.[14]
In its determination of whether the admission of evidence constituted harmless error, a reviewing court must be able to find beyond a reasonable doubt that the error did not contribute to the jury's verdict. *494 C.Cr.P. art. 921; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. West, 568 So.2d 1019 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990). Here, the improperly-admitted statements concerned the defendant's entry into the victim's bedroom three to four weeks prior to the murder while she was asleep, allegedly to check to see if earlier repairs to the air conditioning had worked. However, this was not the only evidence presented of this entry prior to the murder. The State also played the tape recording of the defendant's statement given late on the night of the murder and in that statement, he admits having gone to the apartment and entered it, only to find the victim asleep in her bed. The defendant stated that he knocked on the door and receiving no answer, he entered and went to the victim's room to check the air unit in her closet. He testified that when he walked into the room, the victim awakened and spoke to him. He denied, however, sitting on her bed. Thus, the only portions of the victim's hearsay statement which were not included in the defendant's statement were his alleged sitting on the bed and her fear of him. The rest of the statement is merely cumulative to the defendant's statement. These two facts, while prejudicial to the defendant, cannot be said to have contributed to the jury's verdict. As such, the introduction of these hearsay statements, though error, is harmless. This assignment has no merit.

Pro Se Supplemental Assignment One
By his first supplemental assignment, the defendant contends that reversible error resulted from the prosecutor's reference during opening statement to a non-existent confession. He argues that during the State's opening statement, Ms. Wendy Baldwin referred to a confession that he supposedly made. However, the transcript of the opening statements reveals that the statement was not given by Ms. Baldwin, but rather by Mr. Connick. In addition, a reading of the transcript reveals there was no mention of a confession purportedly made by the defendant. This assignment has no merit.

Pro Se Supplemental Assignment Two
By his second supplemental assignment, the defendant contends that the trial court erred by limiting the cross-examination of a State witness. During the cross-examination of the victim's father, defense counsel asked him if he and his wife had filed a 1.6 million dollar lawsuit against the defendant and the apartment complex, and the victim's father answered affirmatively. Defense counsel then sought to question him further about the lawsuit, and the State objected. A bench conference was held, and after argument the court refused to let the defense pursue this line of questioning.
The defendant contends that he should have been allowed to elicit other information about the civil suit in order to show bias on the part of the victim's mother and father. He argues that because the outcome of the civil suit was totally dependent upon his being found guilty, the victim's parents had a financial stake in the outcome of his trial which should have been disclosed to the jury.
C.E. art. 607 D provides in part:
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
In State v. Kellogg, 350 So.2d 656, 658 (La.1977),[15] the Court stated:
Our jurisprudence permits full cross-examination in order to expose any bias or interest of the witness which might influence his perceptions or color his testimony. State v. Robinson, 337 So.2d *495 1168 (La.1976); State v. Lewis, 328 So.2d 75 (La.1976). Specifically our cases have permitted counsel to inquire into the existence of a civil suit involving the witness or the possibility of civil liability on the part of the witness when such facts indicate that the witness has an interest in the criminal case or is otherwise not totally impartial. State v. Nolan, 341 So.2d 885 (La.1977); State v. Randolph, 334 So.2d 687 (La.1976); State v. White, 206 La. 744, 20 So.2d 10 (1944). The broad right to impeach the witness for bias or interest is dictated not only by R.S. 15:492 but also by the statutory right to full cross-examination (R.S. 15:280) and the constitutional right of confrontation. LA. Const. Art. I, § 16; U.S. Const., Amend. VI; Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).
In Kellogg, the defendant was charged with aggravated battery of the victim which occurred in a deserted parking lot in the middle of the night, and the only other witness to the crime was the victim's wife. The defense sought to impeach the wife's testimony with questions about a civil lawsuit filed by the victim and her husband against the defendant. The Court found that the exclusion of these questions was error and that such error could not be harmless due to the "close factual dispute and the limited number of eyewitnesses". Id. at 658. By contrast, in State v. Lee, 533 So.2d 399 (La.App. 4th Cir.1988), writ den. 536 So.2d 1242 (1989), this court held that questions concerning the existence of a lawsuit filed by the owner of a car hit by the defendant in a DWI case was proper impeachment of the witness, but this court also found that the trial court's refusal to allow this question resulted in harmless error.[16]
C.E. art. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Here, the defense was allowed to establish the existence of the 1.6 million dollar lawsuit filed by the victim's parents against the defendant and the apartment complex where the murder occurred. It was when the defense counsel sought to delve into the details of the lawsuit that he was limited by the court. It is apparent that the existence of the lawsuit was sufficient to show possible bias on the part of the victim's parents, and any further questioning about the details of the lawsuit would be marginally relevant to the case. Thus, the trial court did not err by limiting further cross-examination on the details of the lawsuit. This assignment has no merit.

Pro Se Supplemental Assignment Three
By his final supplemental assignment of error, the defendant contends there was insufficient evidence to support his conviction for first degree murder. Specifically, he alleges that the State failed to exclude every reasonable hypothesis of innocence, including the possibility that the murder was committed by another person, possibly Frank Wright.
In State v. Heck, 560 So.2d 611, 614-615 (La.App. 4th Cir.1990), writ den. 566 So.2d 395 (1990), this court set forth the standard for an appellate review of the sufficiency of evidence to support a defendant's conviction:
In evaluating the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 [61 L.Ed.2d 560] (1979); State v. Jacobs, 504 So.2d 817 (La.1987). Where the conviction is based upon circumstantial evidence, R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Langford, 483 So.2d 979 (La.1986). R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; it is merely an evidentiary guide *496 for the jury when considering circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985).
The defendant was charged with and convicted of first degree murder, which is defined by R.S. 14:30 in part as "the killing of a human being: (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape." The defendant does not dispute that a first degree murder occurred in this case. However, he contends that the State failed to exclude the possibility that another man committed the crime.
The evidence presented by the State showed that the victim had been strangled and had been anally raped. Fecal matter and what appeared to be seminal fluid was found in her rectal area. A piece of rubber was found under her right thigh, and a towel containing a semen-like material was found lying next to her leg. It was estimated that the time of death was between noon and 12:30 p.m.
The defendant was seen leaving the office of the apartment complex with the defendant shortly after noon. A small boy riding his bicycle through the complex saw the victim and the defendant entering her apartment, and the boy testified that he later heard noises like "jamming on the walls" coming from the apartment. Sometime around 12:30, the defendant appeared at the apartment manager's apartment and told her he had corrected the electrical problem at the victim's apartment. At approximately 1:00 p.m., when the victim's sister came by the apartment, she saw the defendant standing outside banging on a meter box, and he told her that the victim had left the apartment to go for a ride on her bike.
After giving his statement to the police late on the night of the murder, the defendant was taken to Charity Hospital where his clothes were seized and penile swabs were taken. Analysis of these items showed the presence of semen and fecal matter on both his penis and his shorts. A blue fiber found in the victim's perianal area was found to be the same color and composition as the fibers from the defendant's shorts. A red fiber found on her white shorts was the same color, size, and composition as the fibers from his underwear. The piece of rubber found under the victim's leg matched a hole in the sole of one of the defendant's shoes, and a shoeprint found in a substance next to an air conditioning unit located outside an open window in the victim's apartment came from the same type of shoe that the defendant had worn. In addition, the State's witnesses testified that the DNA taken from the defendant's blood matched that found in the semen in the towel found next to the victim's leg, while defense witnesses testified that the DNA test results were inconclusive.
The defendant acknowledges these facts, but he raises several points which he contends shows that another person may have committed the murder. He points to the palm prints and fingerprints found at the scene which could not be matched to him or to the victim or her parents. However, at least with respect to the fingerprints, only two were suitable for comparison, and the criminalist testified that it appeared the prints may have been on the surfaces where they were found for some period of time. He also points to a pubic hair which was found in the bathroom and which could not be matched to him, the victim, or her parents. He argues that although the criminalist testified that the blue fiber found on the victim was similar to that found in his shorts, it was not positively identified as coming from him, and there was no testimony that it was compared with the blue trim on her shorts or with the bathrobe which was found on the coffee table near where the victim's body was found. He points out that the criminalist could only testify that the swabs taken from him and the stains on his shorts were "indicative" of seminal fluid and "consistent with" fecal material, and that although the victim had anal lacerations and bloody fecal material in her rectal area, there was no blood found on his shorts or on his penis. He admits that the piece of *497 rubber may have come from his shoe, but he states that there is no evidence that it fell from his shoe during an attack on the victim, and he maintains that had it done so, it would have been found in a different place, nearer the victim's other leg. He also states that it was not unusual that his shoe would match the footprint found next to the air conditioning unit because he was a maintenance man for the apartment complex. And he points out that even if the DNA evidence was valid, it merely pointed out that the DNA pattern of the semen from the towel and his blood occurred in one of 1205 tests conducted on caucasians; it did not positively prove that he was the perpetrator.
The defendant also argues, however, that the testimony of defense witnesses raised the possibility that the murder was committed by a black man seen around the apartment complex that day, who may have been a man named Frank Wright. A clerk at a nearby convenience store testified that very early on the morning of the murder, she was confronted by a black man wearing a heavy plaid jacket who identified himself as a police officer, appeared intoxicated, and began harassing her. She testified that the man had come from the apartment complex area, and he left when another customer arrived.
In his statement given the night of the murder and introduced at trial, the defendant stated that some time after leaving the victim's apartment he saw a black man trying to open the doors of apartments near the victim's apartment. He described the man as thin, approximately 6'1", and sloppily dressed and unkempt. He stated that when he called to the man, the man ran away. The defendant stated that later that afternoon, he saw the man lurking in some bushes behind the victim's apartment, but the man ran away when he saw the defendant.
The defense introduced a memorandum written by a homicide officer to the detective in charge of this investigation which concerned a telephone call from a woman in Texas who stated her daughter told her that a black man named Frank Wright had killed the victim. According to the woman, Wright had also told her daughter that he had killed a man uptown named Bennie Lee the Friday before the murder. However, on rebuttal the detective testified that he called the daughter who told him that Frank Wright was her ex-boyfriend who was now living with a new girlfriend and that the murder of the victim was just the type of thing Wright would do. The detective also testified that there was no indication that a Bennie Lee had been killed uptown the Friday before the murder in this case.
Although there was independent testimony that there was an unknown black man near the apartment complex that day, there was no evidence to tie him to the murder. In addition, although the mother of the Texas woman identified the murderer as Frank Wright, the detective who actually interviewed the Texas woman testified that she could only say that this murder was the type of thing Wright could have done.
The facts set forth above, including the fibers found on the victim and her clothes, the semen and fecal material found on the defendant and his clothes, the piece of rubber from the defendant's shoe found under the victim's leg, the defendant's presence in the victim's apartment near the time of the murder, and the DNA evidence, exclude any reasonable hypothesis of innocence. The points raised by the defendant are valid. However, the jury could have found beyond a reasonable doubt that the defendant was the person who raped and killed the victim. This assignment has no merit.

Pro Se Supplemental Assignment Four
This assignment complains that the trial court committed reversible error in instructing the jury regarding the definition of "reasonable doubt." However, the trial transcript reveals that no defense objections were made during the court's charge to the jury.
According to State v. Dobson, 578 So.2d 533, 534 (La.App. 4th Cir.), writ den., 588 So.2d 1110 (La.1991), an error cannot be corrected after a verdict unless an objection was made at the time of the *498 occurrence, and a contemporaneous objection to the jury charge must be made in order to be reviewed on appeal. Since no objection was lodged by the defense regarding the court's instruction on "reasonable doubt," any objection is considered to be waived. Louisiana Code of Criminal Procedure, art. 841.
Accordingly, defendant's conviction and sentence are hereby affirmed.
AFFIRMED.
PLOTKIN, J., concurs with reasons:
PLOTKIN, Judge, concurring with reasons:
The reliability of DNA evidence in a criminal trial, although generally accepted within the scientific community, is still in a state of transition. The introduction of DNA evidence in this case was error. However, because of the overwhelming extrinsic evidence, apart from the DNA evidence, I find the introduction of the DNA analysis to constitute harmless error. Therefore, I concur.
The last few years have seen an explosion of the use of DNA evidence in both civil and criminal trials. Analysis of the DNA molecule, which carries the unique genetic characteristics of every human being, serves to identify an individual to a very high degree of certainty. It can also be used to exclude a criminal suspect from prosecution or guilt. The use of DNA evidence can be the deciding factor in many cases. Because the use of DNA evidence carries such powerful weight and persuasion, the courts should use such evidence in criminal trials only with great prudence.
The scientific community is in agreement that, when conducted within accepted procedures and standards, the results of DNA analysis are very reliable. See National Research Council, DNA Technology in Forensic Science (1992); Report of New York State Forensic DNA Analysis Panel (1989). However, there remain questions concerning the standards employed by private laboratories who conduct DNA analysis for the prosecution in a given case. The first question is whether they follow "generally accepted" procedures in every case. The second question is whether the procedures used to calculate the probability that the sample from the crime scene matches the sample of the accused, which is an integral part of DNA analysis, are generally accepted.

INHERENT PROBLEMS OF DNA EVIDENCE
Initially it must be noted that, although DNA analysis is reliable, there are inherent problems with conducting a proper analysis with evidence from a crime scene. First, the sample to be tested is often contaminated with other material. For example, fluid from the victim, as well as dirt and other material, are often mixed with the sample to be tested. The absence of an uncontaminated sample makes it very difficult to conduct a proper analysis. Second, a particular sample may be insufficient to conduct a proper test or to allow for repetition of the analysis. Third, unlike a civil case where the person to be tested is known and can give a clean, full sample, we deal in a criminal case with an unknown suspect from whom we may not be able to gain a clean sample in order to establish a match.
The problems outlined above are, in themselves, cause for concern in a criminal trial, but when affiliated with the problems that arise with private laboratories conducting the analysis, such as improper procedures and/or faulty population statistics, serious doubts about the credibility, trustworthiness and reliability of DNA evidence are raised.

PRIVATE LABORATORIES:
In order for evidence derived from new scientific procedures to be admissible in a criminal trial its probative value must outweigh its reasons for exclusion. State v. Catanese, 368 So.2d 975 (La.1979). The Louisiana Supreme Court has adopted this standard in lieu of the stricter standard that the procedures be "generally accepted" in the scientific community, which is followed in most of the United States. As stated, the scientific community already "generally accepts" DNA analysis as reliable if conducted within proper standards and procedures. Thus, it is not the DNA *499 analysis which is under scrutiny but those that conduct the analysis. The persons who conduct the DNA analysis are usually private testing laboratories. The question then becomes whether the private laboratories conduct the DNA analysis properly.
There are a number of problems inherent in private testing laboratories conducting DNA analysis for a criminal trial. First, their procedures are not open to inspection from the general scientific community. The procedures are guarded as a proprietary interest. If their procedures are secret, how can it be said that they are within accepted standards of the scientific community? Additionally, private labs have not been subject to independent quality control examinations or evaluations of their systems. Even if they were subject to independent evaluations, there are no mandatory, uniform standards available with which to compare the procedures employed by the private labs. Furthermore, new methods of conducting DNA analysis are developing rapidly. However, without standards in place there is no way to tell whether these new methods produce accurate and reliable results.
An example of a private lab's failure to follow requisite procedures can be seen in a recent criminal case in Portland, Maine. See Colin Norman, Maine Case Deals Blow to DNA Fingerprinting, 246 Science 1556 (1989). In that case, an individual who did not fit the description of the assailant given by the victim or witnesses was charged with molestation of a five year old child because Lifecodes, a private testing laboratory, found that his DNA matched the DNA taken from the semen samples from the scene of the crime. However, it turned out that Lifecodes had committed several errors in its analysis, such as mislabeling an autoradiograph and not conducting an independent check to confirm the results of one probe used. The result was the dismissal of the case by the prosecution and an undermining of the reliability of private DNA testing labs.
Private testing laboratories must be subject to scrutiny within the court system and their results must be validated before they can be allowed to have an impact on the trial itself. Additionally, due process requires that an accused receive a fair and open hearing regarding the admissibility of DNA evidence against him. A balanced solution to these two problems is for the trial court to hold a hearing prior to trial to determine whether the DNA evidence is admissible in the particular case.
This court in Adams v. Chevron, 589 So.2d 1219 (La.App. 4th Cir.1991) discussed the issue of when expert testimony is admissible at trial. A four-part analysis was introduced to help guide the trial court in determining when the testimony is admissible. I feel a modified version of the Adams v. Chevron analysis is applicable to determine when DNA evidence is admissible in a given case. The four-part analysis applicable to DNA evidence should include the following questions:
(1) Whether the testing facility is properly qualified to conduct the DNA analysis;
(2) Whether the facts relied upon by the testing facility are relied upon by other experts in the field;
(3) Whether the testing facility conducts the analysis using well-founded methodology and procedures;
(4) Whether the DNA evidence's potential for unfair prejudice substantially outweighs its probative value.
The use of a pre-trial hearing, with these guidelines in place, would allow improper procedures to be examined and uncovered by independent experts. Additionally, careless testing, in a given case, could be discovered and its potentially devastating impact avoided. The California Appellate court accepted a similar solution in People v. Barney, 8 Cal.App.4th 798, 10 Cal. Rptr.2d 731 (1st Dist.1992).
Additionally, to facilitate the purpose of the pre-trial hearing, the accused should be allowed a limited discovery, if requested timely, of all the material relating to the DNA evidence so that he may conduct independent examinations of the sample and testing procedures employed in the analysis. In order to protect the proprietary interest of the testing labs, the trial court may issue a protective order limiting the *500 ability of the defendant and his experts to disseminate the methods to persons not associated with the defense. This would satisfy the due process requirement.
This brings us to another problem in using private labs to conduct DNA analysis in criminal cases. First, because the prosecution is funding the analysis, there is potential pressure on the testing labs to find a match between the suspect and the sample from the crime scene. This bias can take the form of altering testing procedures or the expert testimony of an employee of the lab opining that a "match" exists. In the same case reported above, Lifecodes was confronted with a memoranda from its own scientist which showed a different result in one test than was reported to the prosecution and the court. This memoranda was accidentally sent to the defense, which used it to successfully undermine Lifecodes' assertion that the defendant in that case was the actual perpetrator. The prosecution was never told of this inconsistent test result prior to the evidentiary hearing. See Alun Anderson DNA Fingerprinting on Trial, 342 Nature 844 (1989).
Additionally, to boost their credibility, testing labs have made assertions of accuracy which have proven to be unfounded. For example, in a study conducted in California by the Orange County Sheriff's Department crime laboratory, two of the three private laboratories tested made an error in analyzing samples. These mistakes were made even though the laboratory knew its results would be scrutinized carefully. See DNA Report of New York State Forensic DNA Analysis Panel at 29. These scandals have cast serious doubt on the labs' contentions that their methods and results have already been perfected.
Therefore, a pre-trial, evidentiary hearing would serve to lessen the chance of such improper activity having an impact on the trial. It would also protect the defendant and the integrity of the criminal justice system from the introduction of unreliable evidence which carries with it immense weight against the accused.

POPULATION STATISTICS
Another serious problem facing the introduction of a DNA match is the population statistics that must accompany that match. The need for population statistics comes from the nature of DNA testing. The DNA testing focuses on those traits that vary between human beings such as eye color, hair color, etc. Because it would be almost impossible to compare the millions of genes in every DNA molecule from the evidence sample to the accused's DNA, testers focus on a few specific points of the molecule where variance among people occur. It is not enough to show that the perpetrator had blue eyes and that the accused has blue eyes. However, as more traits are tested and more matches occur, the odds that the accused is the perpetrator continue to rise. This is where the population statistics becomes necessary.
Once the testers declare that the perpetrator and the accused share certain traits, the population geneticist calculates the probability of the perpetrator and the accused sharing these traits without being the same person. Because only a relative few traits are tested, a DNA analysis, which shows a match between the suspect and the material from the crime scene, is useless without population statistics which show the probability of the match occurring in different people. In other words, the statistics present in a quantifiable sense, the probability that the sample at the crime scene, although matching the suspect's DNA in many traits, is not from the suspect. This is called a "random match."
The method normally used by the private testing lab to determine these probability numbers is not generally accepted in the scientific community. In fact, in a leading scientific journal, Science, Richard Lewontin of Harvard University and Daniel Hartl of Washington University attacked the reliability of DNA statistical analysis, while Ranajit Chakraborty of the University of Texas and Kenneth Kidd of Yale University defended it. Lewontin & Hartl, Population Genetics in Forensic DNA Typing (Dec. 20, 1991) Science 1745; Chakraborty *501 & Kidd, The Utility of DNA Typing in Forensic Work (Dec. 20, 1991) Science 1735.
In calculating the probability statistics, the normal method used compares each genetic band of the sample to a database to determine the frequency of the band appearing within the database. These databases are usually segregated by race and contain approximately 300-500 different people's DNA band structure. Then the frequencies of all the bands are multiplied together. The problem, Lewontin and Hartl argue, is that this method is based upon incorrect assumptions that (1) members of the racial groups represented in the databases mate within their groups at random and (2) the DNA fragments identified by DNA processing behave independently.
However, according to Lewontin and Hartl, the first assumption is incorrect because people within a larger group tend to mate within identifiable sub-groups because of religious, geographical or ethnic concerns. This has the effect of maintaining genetic differences between identifiable sub-groups within the larger groups. An example would be Italian-Americans who mate with other Italian-Americans, maintaining the separate genetic identity of Italians. However, they are included within the Caucasian database. Thus, it is inappropriate to use broad databases to which all Caucasians, Blacks, or Hispanics may be referred for estimating frequencies because the estimates will not reflect the defendant's subgroup.
Additionally, the assumption that genetic fragments behave independently, which is necessary for the statistical analysis, is unprovable. Lewontin and Hartl conclude that the use of the two preceding assumptions results in inaccurate frequencies and flawed statistical analysis. The erroneous analysis is compounded by multiplying the inaccurate frequencies together, which can greatly magnify the erroneous probability result.
Chakraborty and Kidd vehemently disagree with the conclusions of Lewontin and Hartl. They charge that Lewontin and Hartl exaggerate the mating within subgroups present within America today and the effect that this substructuring would have on the DNA statistical analysis. They concede that there are subgroups; however, they argue that their effect on the statistical analysis is negligible.
The merits of this debate are relevant only to the point that the methods used presently in DNA population analysis are not generally accepted within the scientific community. In fact, there is a raging debate on the accuracy of the statistics and the methods employed to calculate those statistics.
The National Research Council conducted an exhaustive analysis on DNA use in criminal trials. Its findings were published on April 16, 1992. See National Research Council DNA Technology in Forensic Science (1992). It addressed many of the problems concerning the use of DNA in criminal law, including the lack of uniform standards and lack of quality control in the private laboratories. It also addressed the population statistics problem. The Council has suggested that a method be employed which accounts for the subgroups and produces a conservative probability estimate based upon a "ceiling frequency." The report recommends that random samples of 100 persons from each of 15-20 populations, that represent groups relatively homogeneous genetically, be taken. Then, they suggest that researchers take as the "ceiling frequency" either the largest frequency in any of those populations or 5 percent, which ever is larger. "The use of the ceiling principle yields the same frequency of a given genotype, regardless of the suspect's ethnic background, because the reported frequency represents a maximum for any possible ethnic heritage." Id. at S-12.
This method, because it accounts for the basic assumptions which underlie the statistical analysis, should be employed in the statistical analysis being conducted in Louisiana. Until the N.R.C.'s method is implemented within Louisiana, the recommended pre-trial hearing can serve to ascertain whether the methods employed to generate probability statistics, in a particular case, *502 are in keeping with accepted principles such that the result can be considered reliable.

CONCLUSION:
DNA evidence is relevant to criminal prosecutions in Louisiana and should not be deterred; however, because of the serious consequences which follow its introduction, certain reasonable precautions must be initiated. First, all material relating to the analysis, if requested timely, should be made available to the defendant within a reasonable time in order to develop his defense. Second, a pre-trial hearing should be conducted to determine whether, in the particular case, proper procedures were employed during the testing. Third, for population statistics to be allowed, it must be shown that the numbers were computed using accepted principles such that the result can be considered reliable.
In the present case, there was neither an evidentiary hearing to determine whether the procedures employed were adequate nor was there a showing that the population statistics were calculated using accepted methods. The lack of this hearing is important because several errors occurred during the analysis. Had these errors been discovered at an evidentiary hearing, the evidence may have been excluded before the trial.
For example, the testing lab, Lifecodes, misidentified an autoradiograph which, by itself, may not be grounds for exclusion but may have pointed the way to other evidence of careless testing in this case. Additionally, the testing lab, in conducting a frequency analysis based its conclusion upon its Caucasian database. The defendant, claimed that another perpetrator was involved who was black, and argues that the DNA sample should have been compared to the Black database. Whether the testing lab's decision to only compare the sample to the Caucasian database was an improper procedure and whether their probability analysis from that comparison was faulty is an issue which, I feel, must be addressed before trial. Not to do so in this case was error.
However, because there is overwhelming evidence aside from the DNA evidence, such as the fecal matter present on the defendant, the matching piece of rubber from the defendants shoe, and the presence of matching fibers from the defendant's underwear, I find the introduction of the DNA evidence to be harmless error.
I therefore concur in the result.

ON APPLICATION FOR REHEARING
Rehearing Denied.
PLOTKIN, Judge, would grant rehearing.
I would grant rehearing to reconsider this court's original decision affirming the defendant's conviction. I reaffirm my belief that the introduction of the DNA evidence was erroneous. However, I now feel that the introduction of the DNA evidence was prejudicial. Therefore, I believe the conviction and sentence should be reversed and the case should be remanded for a new trial.

HARMLESS ERROR ANALYSIS:
In order for this court to determine that the introduction of the DNA evidence was harmless, we must determine whether there is a reasonable possibility that the evidence complained of might have contributed to the defendant's conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. State v. Green, 493 So.2d 1178, 1185 (La.1986). After reviewing the evidence against the defendant I feel that this court cannot declare such a belief.
The evidence against the defendant is mainly circumstantial. There were no witnesses to the murder. The majority points to several pieces of circumstantial evidence which, when taken cumulatively purportedly prove beyond a reasonable doubt that the defendant committed the crime. However, an examination of the evidence against the defendant shows that the circumstantial evidence, taken cumulatively or separately, is ambiguous. Thus, clearly, when the introduction of the DNA evidence is factored out, the jury could have entertained *503 a reasonable doubt as to the guilt of the defendant.

CIRCUMSTANTIAL EVIDENCE:
First, the blue fibers found on the victim were said to match the fibers of the defendant's undershorts. However, the victim's parents testified that the victim swam a great deal and showered afterward. There were blue towels around the apartment. Thus, the blue fibers that were found on the victim could have come from the towels rather than the defendant's shorts. Additionally, the defendant argues that the towels were never tested for the possibility that the fibers came from the towels and that at least one of the fibers found on the victim was synthetic while his shorts were 100% cotton. The of the fibers on the victim are not conclusively linked to the defendant. The majority does not address this argument.
Second, an unidentified pubic hair in the bathroom sink, as well as unidentified fingerprints, were found at the scene of the crime yet these were never explained by the state. As to the fingerprints, the defendant argues that the State tried to prove that they had been there a long time but were unable to do so. The pubic hair was never addressed by the state. The majority raises the issue of both the pubic hair but does not address the lack of the states's evidence on this point. Additionally, the majority completely ignores the fingerprints.
Third, the defendant points to the report of the woman from Texas who claimed that a Frank Wright had killed the defendant. He argues that two weeks prior to her making the report she actually identified the name of the victim. Defendant argues that the woman could have learned the name of the victim from Frank Wright. Additionally, there were reports of a strange black man in the area near the time of the murder. There was independent testimony concerning the presence of an unidentified black man. Therefore, this report although not conclusive, could have certainly had an impact on the jury.
Fourth, the defendant states that there is testimony which places him at the apartment complex around 12:00 and out of the victim's apartment by 12:20. Thus, he concludes that there was sufficient time for the lurking stranger to attack and kill the victim.
Fifth, a piece of the defendant's shoe sole was found in the apartment. However, this piece of evidence merely places him at the scene of the crime which defendant does not deny.
Sixth, the majority points to perhaps the most damning fact which is that the defendant was taken into custody and was found to have fecal matter and seminal fluid on his penis and underwear. However, two strong arguments cast doubt upon the weight to be given to this evidence. First, it must also be noted that the criminalist testified that the matter found on the defendant was "consistent" with fecal matter and "indicative" of seminal fluid. The defendant's expert witness criticized this report because the criminalist did not perform conclusive tests to determine whether the stains found on the shorts were in actuality fecal matter and seminal fluid. The criminalist did not run these tests even though the tests have existed for many years and are commonly run. Without conclusive test results there seemed to be no clear indication that the material found on the defendant was in fact fecal matter and seminal fluid. Second, the victim had bloody fecal matter on her rectal area due to anal lacerations. However, no blood was found on the defendant's penis or underwear. Thus, even if the matter found on the defendant was fecal matter it is definitely questionable whether the matter came from the victim.
Finally, the defendant notes that the jury deliberated for two days and requested additional instruction as to the doubt needed to acquit. He argues that because of the length of their deliberations and their request for additional instructions clearly the jury was torn between finding him guilty or not guilty. Thus, with such equipoise present, it cannot be said that the introduction of the DNA evidence had little or no affect on the jury's deliberations.
*504 When taking the preceding facts into consideration it is obvious that the jury had a very difficult case before them. Additionally, it is clear that the DNA evidence was the only direct evidence which indicated that the defendant was the perpetrator. Certainly, it is reasonable to conclude that the jury relied upon the DNA evidence in its determination. I find it impossible to say that an erroneous introduction of the only direct evidence available was harmless beyond a reasonable doubt.
Additionally, the error of introducing the DNA evidence was compounded by the erroneous jury charge given to the jury by the trial judge. When the evidentiary error of allowing the introduction of the DNA evidence is coupled with an erroneous law charge, clearly, the defendant was denied a fair trial.

IMPROPER JURY CHARGE:
In instructing the jury on reasonable doubt, the trial judge stated that "[i]t must be such a doubt as would give rise to a grave uncertainty raised in your mind by the reason of the unsatisfactory character of the evidence, one that would make you feel that you had not embodied a conviction to a moral certainty of the defendant's guilt." The Judge continued with "[i]t should be an actual and a substantial doubt." This instruction on reasonable doubt was essentially the same as the instruction given in State v. Cage, 583 So.2d 1125 (La.1991). The instruction was found to be constitutionally infirm by the United States Supreme Court in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). However, on remand, the Louisiana Supreme Court held that the instruction in Cage was harmless error.
However, in the instant case there are two striking differences from the situation in Cage. First, the jury here was clearly confused as to the standard to apply. Second, this case, unlike Cage, where there were several eye witnesses, is based mainly on circumstantial evidence.
Here, after the jury had received their first instruction and deliberated for some time the jury returned and asked several questions. One request was that they be reinstructed "as to what constitutes considerable doubt." (emphasis ours) In answer to their query, the jury received essentially the same charge as before. Thus, the jury's confusion as to the proper standard to apply continued.
The reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error." Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328. In Cage, there was no clear evidence of the jury's confusion as to what constitutes reasonable doubt. The argument in Cage was that the language of the charge was erroneous as to the definition of reasonable doubt thus it could be presumed that the jury applied an erroneous standard. However, it is different matter when the jury is clearly applying an incorrect standard, as the jury in this case did, and nothing is done by the trial judge to correct the jury's confusion.
When the jury is allowed to employ an incorrect standard of proof the entire fact finding process is jeopardized because the conviction rest upon a lesser showing of proof by the prosecution. This is especially true when the State's case, as here, is based mainly upon circumstantial evidence. Clearly, the jury could have entertained a reasonable doubt with so much circumstantial and contradictory evidence before it. Thus, the application of a standard, which required the jury to find that a substantial doubt or grave uncertainty existed before acquitting the defendant, cannot be deemed to be harmless in this case.

CONCLUSION:
For the foregoing reasons, I would grant rehearing and reverse the defendant's conviction and remand for a new trial.
NOTES
[1] At that time, defendant entered a joint plea of "not guilty" and "not guilty by reason of insanity."
[2] The victim was classified as a trainable retarded child.
[3] Testimony of Detective Nicholas also revealed that he observed an open window in the victim's bedroom.
[4] Quatrevingt also stated that while he was in the victim's apartment, he may have touched a white towel which was hanging on the bathroom doorknob.
[5] Although no scratches were noticed on Quatrevingt, he had two, distinct pink, circular patches on the lower portion of his knees.
[6] Fingerprints which were lifted from the window of the victim's apartment did not match those of Quatrevingt. Also, a pubic hair recovered on the soap in the bathroom did not match Quatrevingt's sample.
[7] Testimony established that in random DNA comparison, the odds of another person's DNA matching that of the defendant was 1:1205. It is important to note that the DNA testing performed by Lifecodes, Inc. pertained only to the following samples: (1) the victim's blood; (2) seminal fluid removed from the towel near the victim's leg; (3) semen from victim's leg; and (4) Quatrevingt's blood. According to defense witness, Dr. Craig Cohen, only the semen-like fluid taken from the towel "matched" Quatrevingt's specific genetic characteristics.
[8] According to the transcript of the voir dire proceedings, defense counsel queried, "Would you want to hear from Steven at the end of the State's case," and "Would you require me to put Steven on the stand."
[9] Similarly, the United States Third Circuit Court of Appeal has held that it is not reversible error for a district court to refuse to question prospective jurors on their acceptance of a proposition of law (e.g., a defendant's right not to take the witness stand). According to the Third Circuit, "[Appellants] would have us mandate that prospective jurors state during voir dire that they accept and can apply the substance of a legal precept which necessarily would be treated in the court's instructions to the jury." Furthermore, "appellant confuses an inquiry as to whether one's personal convictions would preclude one from rendering an impartial verdicta proper function of voir direwith an inquiry as to whether one agreed with a rule of law." (emphasis provided) United States v. Wooten, 518 F.2d 943 (3d Cir.1975), cert. den., 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975).
[10] The defense filed a "Motion for Article 403 and 705 Hearing." However, the court determined that the matter would be resolved under Louisiana Evidence Code, Article 704.
[11] In addition to Louisiana, five other states have legislatively recognized the inherent reliability and relevance of forensic DNA evidence. As such, these states have enacted statutes allowing DNA evidence to be admitted in criminal prosecutions. IND.CODE, § 35-37-4-10 (1990); NEV.REV.STAT., § 56.020 (1989); MD.CODE ANN., CTS. & JUD.PROC., § 10-915 (1989); MINN.STAT., §§ 634.25, 634.26 (1990); VA. CODE ANN., § 19.2-270.5 (1990).
[12] A vast majority of state courts have admitted forensic DNA profiling from three major laboratories equipped for DNA analysis (e.g. F.B.I., Cellmark, and Lifecodes Laboratory) and have judicially recognized the DNA findings as reliable, probative and objective.
[13] The defendant also lists a percentage of 2.10, but there are only four percentages listed on S-71/D-15, so it is unknown where he got this number.
[14] The State's argument in its original brief, that the evidence was admissible because it was relevant, does not really address the hearsay issue. Although the statements were relevant, they were hearsay and had to fit within one of the exceptions to the hearsay bar in order to be admissible.
[15] Kellogg was based in part on C.E. art. 607's predecessor, R.S. 15:492, which provided: "When the purpose is to show that in the special case on trial the witness is biased, has an interest, or has been corrupted, it is competent to question him as to any particular fact showing or tending to show such bias, interest or corruption, and unless he distinctly admit such fact, any other witness may be examined to establish the same."
[16] See also State v. Trosclair, 443 So.2d 1098 (La.1983).