DANIEL L. DYSART, Judge.
| defendant, William Danastasio, appeals his convictions by an Orleans parish jury of aggravated rape and aggravated kidnapping. For the reasons that follow, we affirm defendant’s convictions and sentences.
PROCEDURAL BACKGROUND
On January 19, 2011, a grand jury indicted defendant with one count of aggravated rape, a violation of La. R.S. 14:42, and one count of aggravated kidnapping, a violation of La. R.S. 14:44. Defendant pled not guilty. He then moved for an independent inspection of the DNA evidence related to the case. The initial hearing on this motion was continued on the basis that the DNA evidence could not be located. When the hearing was recon *227 vened, Lieutenant Scott Lindsay of the New Orleans Police Department testified that the victim’s undergarment was located (although it contained no biological evidence) but the swabs from the victim’s rape examination kit could not be located.[1] Defendant orally moved to quash the indictment, which the trial court denied. The trial court ruled that the results of the DNA testing performed on the swabs would be admissible at trial.
|2Pefendant then proceeded to trial by jury and was convicted on both counts. He was sentenced to life imprisonment at hard labor on each count, both without benefit of probation, parole or suspension of sentence.
FACTUAL BACKGROUND AND TRIAL TESTIMONY
On the morning of January 19, 1996, N.M.[2] was on her way to work as a certified nurse assistant at a nursing home. She was alone, waiting for the bus around 6:30 a.m. when a vehicle pulled up to the bus stop. The driver, a man wearing a ski mask, pointed a gun at her and demanded her purse. N.M. advised him that she only had $10 in her purse. He cursed at her, forced her to get into his car, made her put her head down and drove to an area under a bridge, where he threatened to kill her and forced her to remove her clothing. He then raped her. Following the assault, he drove N.M. to her workplace and again threatened to kill her if she reported the incident to the police.
N.M. advised her supervisor of the attack and the police were summoned. Detective Joseph Goins responded to the call. He obtained a description from N.M. of her attacker, including his height, weight and build. N.M. also indicated that her attacker had a gold tooth on each side of his mouth. Detective Goins then drove N.M. to the crime scene to look for physical evidence. Finding none, he brought N.M. to the hospital where she was examined and treated. Detective | sGoins obtained N.M.’s rape kit and her underwear and processed them as evidence with the New Orleans Police Department (“NOPD”).
Many years went by during which time no arrests were made or suspects identified. In October, 2003, the swabs from N.M.’s rape kit were sent away for testing to Reliagene Technologies, a private laboratory with whom the NOPD contracted for the processing of backlogged rape kits. According to Gina Pineda, who worked for Reliagene from 1996 through 2007,[3] Relia-gene would perform DNA analyses of the rape exam kits and report the DNA profiles to the NOPD. The NOPD’s crime lab would then re-examine and confirm Relia-gene’s test results, after which the profile data is entered into CODIS.[4]
Ms. Pineda provided details to the jury about DNA and DNA profiling. Ms. Pine-da also detailed for the jury her responsibilities as a Technical Leader and Assistant Lab Director for Reliagene, including the lab’s operating procedures, maintaining and implementing technologies, safety, quality control measures and training of scientists. Her daily activities included care reviews — reviewing all lab work performed on samples to ensure that there *228 were no mistakes and correcting any that were discovered.
Ms. Pineda testified that the DNA testing performed in this matter was subjected to numerous laboratory safeguards to prevent contamination, mistake and/or error. Additionally, the testing performed in this case was virtually identical to that performed by every DNA laboratory around the world.
|4The NOPD delivered the swab and blood samples from N.M.’s rape kit to Reliagene in 2003. Ms. Pineda testified that the lab tested the swabs and that the testing procedure consumed the swabs.[5] Importantly, however, according to Ms. Pineda, any DNA analyst would be able to review Reliagene’s case file and interpret its raw data. Ms. Pineda reviewed the tests results prior to trial and at the trial, confirmed that the findings were accurate.
Anne Montgomery, a DNA analysis expert who was employed by the NOPD in its crime lab from 2001 until 2007, detailed for the jury the manner by which the DNA lab of the NOPD was set up and how it operates. She testified that the lab was a fully functional and accredited lab in 2003, and that it underwent annual and semiannual audits, which are required for participation in the national DNA index system.
Ms. Montgomery also explained to the jury how DNA test results are uploaded into the State’s DNA index system, which then uploads the information into the federal CODIS system. As the DNA Technical Leader for the NOPD crime lab, she reviewed Reliagene’s case file and confirmed that its procedures were properly performed and ensured that the tests results were accurate before she allowed the results to be uploaded into the CODIS database. The results were also reviewed by Jennifer Schroder, the State’s DNA administrator, who uploaded the data results to CODIS.
|fiIn 2006, there was a CODIS hit and according to Ms. Montgomery, in January, 2007, that hit was matched to defendant by the Louisiana State Police, the custodian of the State database. Ms. Montgomery further testified that the State Police’s practice is to issue a letter regarding such a match after it has re-tested the original sample to confirm the accuracy of the profile in the database. The Louisiana State Police issued a match letter on January 26, 2007, which indicated that the DNA evidence from N.M.’s rape kit revealed a “high stringency match” (that all thirteen genetic indicators matched) to that of defendant. In February 2007, Ms. Montgomery issued a “lead letter,” listing defendant by name, social security number, inmate number, date of birth and item number connected to the case.
In September 2010, Detective Jeffrey Keating, who was assigned to the Sex Crimes Section of the NOPD, was assigned the 1996 cold case involving N.M. He testified that on September 7, 2010, he entered the DNA test results from N.M.’s rape into CODIS which produced a match identifying defendant as the donor of the DNA evidence in N.M.’s rape.[6] Detective Keating next ran defendant’s name through the system and learned that he had been convicted of armed robbery in December, 1997. He then obtained a war *229 rant for defendant’s arrest and after obtaining a search warrant, obtained two buccal swabs from the inside of defendant’s mouth and logged them into the Central Evidence and Property section (“CP & E”) of the NOPD. Detective Keat-ing took the swabs to the Louisiana State | fiPoIice Crime Lab where DNA testing was conducted and a comparison made with the DNA results from N.M.’s 1996 rape. The test results confirmed that a DNA match between the buccal swabs he obtained and the testing performed by Re-liagene in N.M.’s case.
Ms. Angela DeLatte, who in November 2010 was employed by the Louisiana State Police Crime Lab, was the person who performed the comparison of the DNA evidence. She testified that the sample from N.M.’s rape kit, which contained a mixture of N.M.’s and defendant’s DNA, was 1. 20 quadrillion times more likely a mixture of N.M.’s and defendant’s DNA than that of N.M. and any other male. DISCUSSION[7]

Fourth assignment of error

In his fourth assignment of error, defendant claims that the evidence was insufficient to uphold his conviction. “When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.” State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55. Accordingly, we address this assignment of error first.
Defendant maintains that his conviction was based solely on “questionable DNA results,” and suggests that there was “no identification, no witnesses, and [^literally no police investigation,” all of which leads to the conclusion that the evidence “was insufficient to uphold his conviction.”
In reviewing whether the evidence presented in a case is sufficient to support a conviction, we are governed by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and repeatedly followed by Louisiana courts. This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093 (citing State v. Ragas, 98-0011 (LaApp. 4 Cir. 7/28/99), 744 So.2d 99) as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether *230 the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1819 (La.1992) at 1824.
Defendant’s argument largely focuses on whether the evidence supports the jury’s finding that he was the person who raped N.M. He maintains that the DNA 18profile was “questionable” in that it was merely “a result on a piece of paper generated by a computer, based off of a sample of DNA that was tested by several nameless, faceless people [he] had no access to, a sample that can not [sic] be tested by [him] or anyone else today to verify its accuracy or reliability.” We disagree. While our jurisprudence reflects that, “when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification,”[8] we find that the State met its burden.
In this case, defendant was convicted of two crimes. The first, aggravated rape, is defined by La. R.S. 14:42, in pertinent part, as:
[A] rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
His second conviction was for aggravated kidnapping pursuant to La. R.S. 14:44, which provides, in pertinent part:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control:
The forcible seizing and carrying of any person from one place to another;
| ¡/The abduction of a victim with the intent to commit rape constitutes an intent to force the victim to give up something of apparent or prospective value. State v. Harris, 01-2730 (La.1/19/05), 892 So.2d 1238.
There is no question that N.M. was the victim of an aggravated rape as the perpetrator possessed a gun. There is equally no question that N.M. was the victim of an aggravated kidnapping as per La. R.S. 14:44 and Harris. The only question, therefore, is whether the State negated any reasonable probability of defendant’s misidentification. As will be discussed in greater detail in the next assignment of error, we find that the DNA evidence in this case, identifying defendant as N.M.’s attacker was reliable. Similarly, the testimony of the State’s DNA experts, which the jury found credible, provided direct scientific evidence identifying the defendant as the man who raped the victim. We therefore find that the State satisfied its burden of “negating any reasonable probability of misidentification.” See State v. Long, 408 So.2d 1221, 1227 (La.1982). We find no merit in this assignment of error.

First assignment of error

In his first assignment of error, defendant argues that the trial court erred in admitting the DNA evidence at trial. He bases his argument on three points; (1) the lack of chain of custody of the DNA evidence; (2) the non-existence of the actual DNA material for his own testing and *231 (3) his inability to question several witnesses regarding the procedures involved in uploading the DNA profile into CODIS.
| inRegarding the chain of custody argument, defendant maintains that the DNA evidence should have been excluded because “[w]ithout the proper and complete chain of custody, the reliability of the test results can not [sic] be guaranteed.” He bases his conclusion that the chain of custody was defective in two respects: First, while Detective Goins retrieved the rape kit and N.M.’s undergarment from the hospital, he was not actually present in the room when N.M. was examined. Rather, he obtained the evidence two days after the incident. Defendant argues that because there is no indication of “who had” the rape kit during that two day period or any assurance that it was the same rape kit as that of N.M., and because the physician who conducted the exam did not testify, there is no “complete chain of custody” for this evidence. Second, he argues that several witnesses crucial to the chain of custody did not testify (presenting a Sixth Amendment issue) — Remesar Castle, who received the evidence from Detective Goins at the NOPD CP & C section; Karen Holmes, of the NOPD Crime Lab, who turned over the evidence to Reliagene; “various individuals” who performed testing for Reliagene; and Jennifer Schroder, the NOPD CODIS administrator who uploaded the DNA profile.
The Louisiana Supreme Court, in the seminal case of State v. Sweeney, 443 So.2d 522 (La.1983), set forth the general rules regarding the admissibility of demonstrative evidence at trial:
lnTo admit demonstrative evidence at trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence. State v. Drew, 360 So.2d 500 (La.1978). The law does not require that the evidence as to custody eliminate all possibilities that the object has been altered. For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case. A preponderance of the evidence is sufficient. State v. Dotson, 260 La. 471, 256 So.2d 594 (1971), cert. denied, 409 U.S. 913, 93 S.Ct. 242, 34 L.Ed.2d 173 (1972).
Id. at 528.
This Court reiterated the principles set forth in Sweeney and further reiterated the well-settled principle that “[a] defect in the chain of custody goes to the weight of the evidence rather than its admissibility.” State v. Ferguson, 09-1422, p. 33 (La.App. 4 Cir. 12/15/10), 54 So.3d 152, 170 (citations omitted). Evidence as to custody suffices if it establishes that it is more probable than not that the object is the one connected to the case. Id., 09-1422, p. 33, 54 So.3d at 171. “A trial court is vested with great discretion [in] determining whether a party has laid a proper foundation for the introduction of evidence.” Id.
In the instant matter, Detective Goins testified that upon receiving the rape kit from medical personnel, he deposited it in the NOPD’s CE & P section under item number A31528-96 and received a receipt, which the State produced and he identified at trial.
The State’s expert witnesses, Ms. Gina Pineda, Ms. Anne Montgomery and Ms. Angela DeLatte, identified numerous exhibits that documented the chain of | iacustody of the evidence logged into CP & E under item number A31528-96. *232 Moreover, Ms. Pineda and Ms. Montgomery, respectively, chronicled the handling of the rape exam kit while it was in Relia-gene’s possession, the return of the kit to the NOPD and subsequent testing performed by State authorities.
Based on a review of the foundation laid in this case, the record supports a finding that it is more probable than not that the tested scientific evidence was connected to this case. Further, the record reveals no indication that the evidence was tampered with or compromised, or that the testing procedures were defective in any way. See Ferguson. The jury heard the evidence establishing the chain of custody of the State’s DNA evidence and determined that the chain was reliable. Having thoroughly reviewed the record, we find no abuse in the trial court’s admission of the DNA evidence in this case. We find that this argument has no merit.
Next, defendant maintains that his defense was prejudiced insofar as the DNA sample no longer exists and therefore, he was unable to conduct his own independent testing. His argument that the evidence was destroyed as a result of Hurricane Katrina is misplaced, as the testimony at trial reflected that the DNA sample was consumed in the testing conducted by Reliagene.
Courts have recognized that a defendant’s right to present a defense may be impaired when a defendant is denied the opportunity to have his expert examine a piece of critical evidence. State v. Clark, 414 So.2d 737, 740 (La.1982) (“[fjundamen-tal fairness is violated when a criminal defendant on trial for his |1sliberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion-”). However, the Clark court explicitly stated that the “unavailability of the evidence for further testing does not in itself so prejudice defendant’s right to a fair trial as to warrant a dismissal of the prosecution.” Id., 414 So.2d at 741.
In this matter, defendant does not identify the witness(es) he wished to examine the DNA evidence or the substance of their testimony. Nor has he made a showing that independent examination of the DNA evidence would be subject to scientific disagreement, especially considering that each of the State’s experts testified that any DNA expert could review the raw data in this case and make an independent analysis.
In State v. Harris, 01-2730, p. 21 (La.1/19/05), 892 So.2d 1238, 1253, n. 31, the Louisiana Supreme Court found no merit in defendant’s argument that his due process rights were violated when DNA evidence was destroyed, and he was prevented from testing it. In Harris, as in this case, the defendant had not alleged bad faith by the State in the destruction of the evidence. Instead, defense counsel here attacked the trustworthiness of police handling of the evidence and the entire case (as the defense did in Harris).
At trial, defense counsel elicited from the State’s expert witnesses that DNA testing procedure is not infallible; that there is room for human error; and that | UDNA evidence can degrade with the passage of time.[9] In addition, defense counsel was able to reveal to the jury, through cross-examination, that the reason he was *233 unable to conduct his own independent testing on the DNA evidence was because it was destroyed by testing on behalf of the State.
The jury also learned of the fail safe testing protocols to guard against human error; that the DNA profile was partially computer generated; and that the test results were accurate within a reasonable degree of scientific certainty. The experts testified at length about the uniform testing protocol, the exhaustive re-testing of lab findings and peer review of test results. Finally, the State’s experts’ uncon-troverted testimony informed the jury that any trained scientist could review the raw data in this case and render an opinion.
Based on the evidence presented, the defendant has not demonstrated that his right to put on a defense was adversely affected by the absence of the DNA evidence or his ability to perform independent analysis of the DNA evidence. Nor has defendant in any way demonstrated in any articulable way that the DNA testing was unreliable in this case. We find no merit to this assignment of error.
Third, defendant maintains that his Sixth Amendment right to confront the witnesses against him was violated because some of the witnesses who were involved in testing and analyzing the DNA evidence and uploading it into CODIS did not testify at trial.[10] He relies heavily on the U.S. Supreme Court case of Bullcoming v. New Mexico. — U.S. -. 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). In Bullcoming, the defendant’s conviction of aggravated driving while intoxicated was based primarily on a forensic laboratory report which certified that his blood-alcohol concentration was above the legal limit. The analyst who signed the certification on the report did not testify at trial; rather, the prosecution called another analyst familiar with the laboratory’s procedures at trial. The Bullcoming Court held that the report could be used against the defendant only if the defendant had the opportunity to confront at trial the analyst who performed, observed, or supervised the forensic examination. The Court noted that the Sixth Amendment was not satisfied by the “surrogate” witness who was familiar with the lab’s practices but who had formed no independent opinion concerning the forensic examination results. Id., — U.S. -, 131 S.Ct. at 2715-16. In so holding, the Court stated that the key question in Confrontation Clause cases is whether the evidence sought to be admitted is testimonial in nature: “As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness.” Id., — U.S. -, 131 S.Ct. at 2713.
The U.S. Supreme Court later considered the issue of whether the Sixth Amendment would be violated by the introduction of a report of an independent laboratory which created a DNA profile identifying the defendant as the I ^perpetrator of a rape in Williams v. Illinois, — U.S.-, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). Holding that there was no Confrontation Clause violation, the Court noted:
... [T]he primary purpose of the Cell-mark report, viewed objectively, was not *234 to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner— or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no “prospect of fabrication” and no incentive to produce anything other than a scientifically sound and reliable profile.
Id., 132 S.Ct. at 2243-44. The Court further explained:
The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cell-mark provided was not inherently incul-patory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. See Perry v. New Hampshire, 565 U.S.-, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may 117always be subpoenaed by the defense and questioned at trial.
Id., 132 S.Ct. at 2228.
This Court recently considered Bullcoming and Williams and their progeny in State v. Grimes, 11-0984 (La.App. 4 Cir. 2/20/13), 109 So.3d 1007, writ denied, 13-0625 (La.10/11/13), 123 So.3d 1216. In Grimes, the defendant was convicted of aggravated rape, aggravated kidnapping, and sexual battery, involving two victims and occurring in the years 1993 and 1997. At the time of the attacks, the perpetrator was unknown, although sexual assault kits were collected and DNA analyses in 2005 identified the defendant as the perpetrator. Citing Williams, this Court noted that, “even if forensic DNA reports are admitted in evidence without in-court testimony of the scientist/analyst who either signed the certification or performed or observed the test reported in the certification (see Bullcoming), generally, there is no Sixth Amendment Confrontation Clause violation because the reports are not testimonial.” Id., 11-0984, pp. 28-29, 109 So.3d at 1023.
Similarly, in State v. Bolden, 11-0237 (La.App. 3 Cir. 10/5/11), 103 So.3d 377, a case of aggravated rape, the State’s DNA expert testified, over defendant’s objection, that the DNA profile, developed from a blood sample taken from the defendant, matched the DNA profile developed by other technicians who did not testify at *235 trial, from biological samples taken from the victims after they were sexually assaulted. The samples were taken from the victims nearly ten years before a search of the CODIS data base identified defendant as the donor of the samples. One profile was developed by the Acadiana Criminalis-tics Laboratory, |isthe other by a private laboratory in Tennessee under contract with Acadiana to test the sample using the same testing protocols and computer software. The results of the victims’ tests were used as a basis of comparison with the defendant’s DNA profile, but the reports themselves were not introduced into evidence under the provisions of R.S. 15:499 (certificates of criminalistics laboratories). The Third Circuit, setting aside the defendant’s conviction, ruled, inter alia, that the trial court erred in allowing the State to use the results of the DNA tests at trial without producing the individuals who conducted the tests for confrontation and cross-examination.
The Louisiana Supreme Court reversed the Third Circuit on the basis of Williams, supra, finding:
No error under the Confrontation Clause occurs when a DNA expert testifies that in his or her opinion the DNA profile developed from a sample taken from defendant matches the DNA profile developed by other, non-testifying technicians from biological samples taken from the victim of a sexual assault if: the tests on the victim’s samples were conducted before the defendant was identified as the assailant or targeted as a suspect, Williams, 567 U.S. at-, 182 S.Ct. at 2242-43.
State v. Bolden, 11-2435, p. 4, (La.10/26/12), 108 So.3d 1159, 1161-62. The Court further noted that “as a matter of Louisiana law, the computer printouts of the profiles developed from the victims’ samples by the two laboratories using the same software did not constitute statements of a declarant for purposes of La. C.E. art. 801 (defining a statement as an oral or written assertion by a declarant, or ‘a person who makes a statement’) ... and the factual assertions made by the technicians that the profiles related to the specific samples delivered to the laboratories were admissible despite their hearsay 119character under the business or public records exceptions to the hearsay rule in La.C.E. art. 803(6) and 803(8).” Id., 11-2435, p. 5, 108 So.3d at 1162 (internal citations omitted).
Under this body of law and our review of the record, we find that the State’s expert witnesses’ testimony and the DNA report formulated by Reliagene were not testimonial evidence as “this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.... Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.” Williams, — U.S. at -, 132 S.Ct. at 2228.
Further, the report was compiled by Reliagene, an accredited laboratory, which tested the evidence obtained from the victim’s rape exam kit and rendered a report on its findings. The State’s experts, Pine-da, Montgomery and DeLatte, each testified as to having reviewed the laboratory report prior to, and at trial, and deemed the findings accurate. These experts guided the jury through the raw data upon which the testing was based and explained precisely how the male DNA profile was extracted from that data. The DNA report was not prepared for the primary purpose of accusing the defendant as a *236 suspect in the rape. The tests on the victim’s samples were extracted in 1996 and tested and uploaded to the State’s CODIS database in 2003, all before defendant was identified as the victim’s assailant or targeted as a suspect. The primary-purpose of the testing was not to target a specific or known suspect, as noted in Bullcoming, but rather to catch an |2nunknown rapist. Cf. Williams, 567 U.S. at-, 132 S.Ct. at 2248-49. Accordingly, we conclude that this assignment of error has no merit.

Second assignment of error

Defendant next argues that the trial court erred in allowing other crimes evidence at trial. More particularly, he argues that the trial court erred in allowing evidence of his prior conviction for attempted armed robbery at trial. At the outset, defendant notes that, while the State filed a Prieur notice that it intended to use evidence of defendant’s attempted armed robbery, the record does not reflect a ruling on its admissibility. While the docket master does not reflect that the hearing was held, at the commencement of trial, counsel for the State commented that “the court ruled on a Prieur motion-back in September 2011, allowing the State to Prieur [sic] in the 1997 conviction of the defendant for two counts of armed robbery.” The State reiterated its intent to use the prior convictions at trial.
The docket master indicates that the Prieur hearing was initially set for March 3, 2011 but was continued several times. The last mention of a Prieur hearing is noted on September 19, 2011, setting the hearing for the following day, September 20, 2011. In fact, the September 20, 2011 docket entry reflects that defendant “appeared for Prieur hearing with counsel.” The minute entry of that date states essentially the same “[t]he defendant ... appeared before the court for the Prieur hearing with counsel.” Based on these entries and the trial transcript, we find that the trial court did, in fact, issue a ruling, allowing the Prieur evidence at trial.
As to the merits, the defendant maintains that the State failed to demonstrate the admissibility of the other crimes evidence under La. C.E. art. 404(B), insofar as the two crimes were insufficiently similar. He further argues that, even if Inadmissible, the other crimes evidence was unduly prejudicial and should have therefore been excluded.
We pretermit a discussion of whether the two crimes were sufficiently similar under La. C.E. art. 404(B)(1) or whether the prior conviction was unduly prejudicial. Our jurisprudence reflects that, with respect to the admission of other crimes evidence at trial, a trial court’s ruling is subject to the harmless error analysis. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Scoggins, 10-0869, p. 15 (La.App. 4 Cir. 6/17/11), 70 So.3d 145, 154 (citing State v. Walker, 99-2868, p. 8 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, 223). In determining whether an error is harmless, the Louisiana Supreme Court, adopting the harmless error test set forth in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), stated that “ ‘[t]he inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.’ ” State v. Patterson, 12-2042, p. 6 (La.3/19/13), 112 So.3d 806, 810, citing, State v. Lewis, 12-1021, p. 15 (La.3/19/13), 112 So.3d 796, 805. As the Lewis court indicated, “the burden of proving harmless error rests squarely on the shoulders of the party benefitting from the error. Chapman *237 [supra], 386 U.S. at 24, 87 S.Ct. 824.” Id., 12-1021, pp. 15-16, 112 So.3d at 805.
Considering the DNA evidence in this case, we find that defendant’s guilty verdict was surely unattributable to the admission of the other crimes evidence. Thus, even if the trial court erred in admitting evidence of defendant’s other crimes, such admission was harmless error. We find no merit to this assignment of error.

122Third assignment of error

Defendant’s third assignment of error asserts that his defense was hindered by the lack of evidence that was admitted at trial. He argues that, “[a]fter the record was lodged,” his counsel moved to supplement the record with the transcript from the Prieur hearing and “certain exhibits admitted at trial.” He maintains that he received a note on September 17, 2012 “by someone from the property room” that it “did not receive any evidence,” further arguing that “[t]his is not the first case in the last year where the Property Room is not in possession of evidence after the conclusion of a trial.”[11] He suggests that “the lack of evidence ... deprives [him] of his right to a full and meaningful review of his convictions.”
Defendant does not specifically state what “evidence” he maintains is missing from the record. It is clear that defendant’s argument in this assignment of error pertains to the “paperwork and test results that allegedly showed a DNA profile that implicated” defendant. He cites State v. Walker, 02-1350, p. 12 (La.App. 4 Cir. 4/9/03), 844 So.2d 1060, 1067 for the principle that, where evidence admitted at trial is not available for review, a defendant is prejudiced because “[the] exhibits were the critical evidence considered by the jury in finding the defendant guilty.”
There is no dispute that Relia-gene’s testing consumed the samples from N.M.’s rape kit. However, we previously addressed this issue and the Supreme Court’s finding that the “unavailability of the evidence for further testing does not in itself so prejudice defendant’s right to a fair trial as to warrant a dismissal of the prosecution.” Clark, supra, 414 So.2d at 741. In Clark, the court found that the Instate was negligent in its handling of evidence and in failing to properly preserve the evidence for further testing. However, it noted that the defendant could present evidence to show the inconclusive nature of the tests performed at the crime lab, which the jury could evaluate and consider. The court relied in part on the case of State v. Boyd, 359 So.2d 931 (La.1978), which found no error in the trial court’s denial of a motion for mistrial based on the defendant’s inability to independently examine a blood sample taken from his pants, as it had been consumed by the State’s testing. In Boyd, the court noted that even had the State been willing to comply with defendant’s request, it would have been unable to do so.
A similar situation is presented by the instant matter. The record reflects that defendant received responses to his discovery motions on March 3, 2011, following which he moved for an independent inspection of the DNA evidence on September 20, 2011. After learning that the there was no longer any DNA evidence for fur *238 ther testing, defendant moved to quash his indictment. At a discovery hearing held on October 4, 2011, in response to questioning by the trial court, the State noted that “[t]he raw data — that was taken from [Reliagene’s] testing is available to the defense. And any defense expert can look at that raw data. It has been made available to them.”
Thus, prior to trial, defendant had access to the raw data upon which the DNA profile was obtained. Likewise, at trial he had the opportunity to challenge the raw data, test results and testing protocol, by cross-examining the State’s experts. He suggested no manner in which the DNA testing, testing protocols or test results were deficient or inaccurate. Nor did he call any witness to challenge | ^any of the testing procedures or test results at trial. While he was able to elicit admissions in cross-examination that it is possible that there may have been mistakes in the testing process, he points to no facts to support a contention that mistakes in that process produced an incorrect or unreliable result. Accordingly, we find no merit to this assignment of error.
CONCLUSION
For the foregoing reasons, the convictions and sentences of defendant, William Danastasio, are affirmed.
AFFIRMED.
JENKINS, J., Dissents with Reasons.

. Apparently, the evidence was lost in the flooding caused as a result of Hurricane Katrina.

. We refer to the victim in this opinion by her initials, N.M., to protect her privacy.

. Reliagene was acquired in 2007 by Orchid-Selmark and Ms. Pineda continued to work for that company as an assistant lab director and technical leader.

. CODIS stands for Combined DNA Index System, a database for DNA profiles.

. According to Officer John Fulgencio of the NOPD Central Evidence and Property section, the swab tips were consumed and that only the sticks were returned by Reliagene. Those sticks were destroyed as a result of Hurricane Katrina.

. According to Detective Keating, there was a backlog of CODIS "lead letters” including the one which identified defendant dated September 13, 2007.

. We have reviewed the record for errors patent and found none.

. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311.

. In that regard, we note that Anne Montgomery testified that, even with the degradation of a DNA sample (through various elements such as heat, humidity, moisture and mildew), there can be only two results-either no result at all from the testing or a correct result. She indicated that there would not be "an incorrect result because of degradation.”

. We note that counsel for defendant made no objection at trial to the introduction of the DNA expert testimony or DNA evidence; however, because defendant filed a motion for an independent examination of the DNA evidence, and objected to its introduction at the hearing on October 4, 2011, we review this argument. See, e.g., State v. Taylor, 12-0345 (La.App. 4 Cir. 6/26/13), 118 So.3d 65.

. It is well-settled that "[a]ppellate courts are courts of record and may not review evidence that is not in the appellate record, or receive new evidence.” Denoux v. Vessel Mgmt. Servs., Inc., 07-2143, p. 6 (La.5/21/08), 983 So.2d 84, 88. Likewise, argument of counsel is not evidence. In re Melancon, 051702, p. 7 (La.7/10/06), 935 So.2d 661, 666. We therefore do not consider any argument with respect to the September 17, 2012 "note.”