PAUL A. BONIN, Judge.
11 Sherman Hampton, who is charged with four counts of aggravated rape, moved for & Daubert-Foret pretrial hearing with respect to some of the DNA evidence which the prosecution proposes to introduce at the trial. Mr. Hampton, by supplemental motion following his receipt of additional discovery materials, specifically described 'but did not support his concerns about the reliability of the DNA evidence, the collection of which dates to as earty as 1992. The prosecution objected to a pretrial hearing to test the reliability of its proposed DNA evidence, and the trial, judge denied Mr. Hampton’s motion.
Mr. Hampton applied to us for a supervisory writ. We directed that the prosecution respond to the application and, following its response, stayed the district court proceedings and ordered that the. district court record be filed with us. We also ordered oral argument in this matter.
We grant the supervisory writ. We find that the trial judge abused her discretion by failing to properly éxercise her ga-tekeeping function and' affording the defendant' a Daubert-Foret pretrial hearing appropriate to his claims respecting Lthe unreliability of some of the prosecution’s proposed DNA evidence. We remand the matter to the district court for an appropriate hearing. We also lift the stay which was previously issued.
We explain our decision in more detail below.
I
We begin our explanation by providing some factual and procedural background to place the controversy in context.
A
In late 2006, the New Orleans Police Department’s Scientific Investigation Division issued a “Lead Letter” to the cold-case sex crimes -unit. The Lead 'Letter reports that during a search of■ the Louisiana State DNA Index System four DNA samples recovered from different aggravated rape investigations “matched” or “hit” to “convicted offender Sherman Hampton.”
At the time of receipt of the Lead Letter and the revival of the police investigations, Mr. Hampton was incarcerated following simple burglary convictions in 2004, . See La, R.S. 15:609 (authorization' to obtain *772 DNA samples from convicted felons).[1] In the course of the follow-up investigations, the police obtained arrest warrants for Mr. Hampton on each of the four aggravated rape charges. He was arrested in New Orleans following his release from prison.
The earliest charge dates to June 28, 1992. The victim described to police that she was waiting for a bus during the predawn hours when she was abducted |3by her attacker and dragged to a nearby apartment. There, her attacker threatened to penetrate her with a coat hanger if she did not submit to intercourse with him. She did not know or recognize him,, but her attacker told her his name was “Sherman.” The victim was treated at the hospital and a sperm sample was collected from her which was subjected to DNA analysis.
The next charge dates to May 20, 1995. In the pre-dawn hours, the victim was walking through a courtyard when her attacker grabbed her. He was armed with a gun. He led her to a stairwell where he forced her to submit to intercourse with him. She too was treated at a hospital where she underwent a sexual assault examination. The collected DNA material was submitted to testing.
The next occurrence of a rape is not until April 17, 2003. The record, however, does not contain the arrest warrant relating to this charge nor a preliminary hearing transcript on this charge.
The final occurrence is May 31, 2003. The victim, while sleeping in her bed, was attacked in the pre-dawn hours. Her attacker, armed with a knife, warned her that if she screamed, he would slice her throat. He then forced her to submit to intercourse. She too underwent a sexual assault exam and DNA material was collected.
None of the victims have ever identified Mr. Hampton nor, to date, have any been asked to attempt to identify him from, for example, an in-person line-up or a photographic array. Notably, following Mr. Hampton’s arrest in 2013, the prosecution obtained a search warrant authorizing the buccal swabbing of Mr. |4Hampton for confirmation of the earlier DNA results. We understand the results have been confirmed.
A conviction of aggravated rape on each of the dates of the charged offenses carries a mandatory life-without-parole sentence. And the identity of Mr. Hampton, who is sixty-one years old, as the perpetrator of each of these aggravated rapes rests nearly exclusively on the reliability of the DNA results.
B
The Grand Jury indicted Mr. Hampton in January 2014, charging him with all four counts of aggravated rape. As early as April 2014, Mr. Hampton filed a motion to suppress the DNA evidence, which identified Angela Delatte as the “DNA witness.” This motion does not appear to have been pursued, however.
From June 2014 through March 2015, the trial court found Mr. Hampton to be incompetent. Following his restoration to competency, Mr. Hampton began to actively pursue through discovery motions disclosure information and materials related to DNA results in his case. For reasons not at all clear irom the record, the prosecution was turning over discoverable evidence in dribs and drabs. By way of illustration, not until May 2015, did the *773 prosecution deliver a two-page DNA report to the defense which pertained only to a single count; during the summer, test results were provided on two counts but no test results on the other two counts. In early September 2015, more testing sheets were delivered on all counts; in late September 2015, a CD containing the file of Reliagene, the firm which conducted the DNA testing, was produced to the defense.
|fiNone of these evidentiary materials have been submitted to us for our review nor, so far as the record discloses, were any of these materials viewed by or submitted to the trial judge for her review.
Mr. Hampton then filed a motion to continue to allow him time to supplement his previously-filed motion for a Daubert hearing. At that time his counsel advised the trial judge that he had not had time to consult with a defense expert regarding the just-disclosed Reliagene file. The trial judge granted the motion.
Within a week, Mr. Hampton filed his supplemental motion for a Daubert-Foret hearing.
II
Mr. Hampton, as we already stated, specifically described but did not support his concerns about the reliability of the DNA testing conducted by Reliagene in this matter.
First, he states in his motion that the prosecution no longer uses Reliagene for its DNA testing although he offers no reason for its discontinuance of Reliagene’s services. The unreliability of Reliagene’s testing is not a necessary inference from its discontinuance. Next he emphasizes that it is based upon Reliagene’s testing that his profile was developed as the perpetrator but that none of the sexual assault kits have been re-tested by the state police crime laboratory or any other entity.
| fiSecond, he alleges that the earliest testing dates to 1992, that since that time Reliagene’s testing ■ methodology has changed, that current procedures to ensure reliability were not used by Relia-gene, that Reliagene’s testing in this case did not comply with “critical” calibration of equipment, and that Reliagene did not maintain “sufficient” standards and -controls. Mr. Hampton, however, does not give any definitive detail with' respect to these conclusory allegations.
Third, Mr. Hampton points out that the Reliagene case file indicates‘that some of the “documentation” of testing done in this case has been destroyed. He does not supply any detail of the materiality or even relevance of the destroyed materials.
But, fourth, in his most detailed allegation, he reports that “some” of the tests are “less complete” and “are missing essential loci for reliable testing.” He further reports that in “at least one of the profiles” only nine loci can be tested but that at least thirteen are necessary for reliable testing procedures. He asserts that the scientific community finds • that less loci make for a less reliable result although he does not state forthrightly that such result is considered unreliable by the scientific community. See n. 5, post.
And finally, he reports that “other profiles” involve “mixed” samples and are missing essential loci “critical” for determining known or potential error rates.
Based upon these considerations, he requested a Daubert-Foret hearing with respect to the testing of the sexual assault kits only. Mr. Hampton, we must point out, is not seeking a “gatekeeper” hearing with respect to the DNA testing of Mr. pHampton himself at the time of his relatively recent felony conviction or the most *774 recent testing of the material collected by buccal swabbing obtained pursuant to the search warrant following his arrest on these charges in 2013.
Beyond its earlier proposition that there was no requirement that such a hearing be held in every case and that chrrent protocols are typical, the prosecution offered no further, countervailing argument or response in 'Writing. We should note, however, that the prosecution suggests to us that all of the DNA testing.(as opposed to DNA sample collection) in this case was conducted after 2003. But the prosecution’s suggestion, like Mr. Hampton’s allegations in his supplemental motion, is not supported by any evidence introduced in the trial court,
- The trial judge, in denying Mr. Hampton’s motion and thus refusing to require the prosecution to prove the reliability of the challenged ,DNA evidence it intended to use against Mr. Hampton, stated that “[t]he Defense has failed to offer any evidence to support a finding that the testing performed in any way deviated from the standard practice or was in some way unreliable.”
Because this is an evidentiary ruling relating to the admission or exclusion of evidence, we review the ruling under an abuse-of-discretion standard. See State v. Wright, 11-0141, pp. 10-11 (La.12/6/11), 79 So.3d 309, 316; State v. Hamdalla, 12-1413, p. 1 (La.App. 4 Cir. 10/2/13), 126 So.3d 619, 620.
Ill
In this Part we turn our attention to a trial judge’s important gatekeeping function with respect expert testimony and scientific evidence..
| «At the outset, however, we acknowledge that the trial judge’s ruling in this matter was no doubt, in no small measure, influenced by the considerable confidence that the courts and the public place in the reliability of DNA testing. The legislature itself has since 1989 explicitly provided that evidence of DNA profiles “offered to establish the identity of the offender to any crime is relevant as proof in conformity with the Louisiana Code of Evidence.” La. R.S. 16:441.1 (emphasis added). And more than just relevancy to identity, which, of course, is not the issue in a Daubert-Foret proceeding, the legislature has expressed its confidence in the reliability of DNA evidence, which is the issue in such a proceeding. See La.C.Cr.P. art. 926.1 (Application for DNA testing); La. C.Cr.P. art. 930.3(7) (post-conviction relief shall be granted if “[t]he results of DNA testing performed pursuant to an application granted under Article 926.1 proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted.”).
A
Under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 609 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993), the trial court is required to perform a “gatekeeping” function to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.” Daubert, 509 U.S. at 589, 113 S.Ct. 2786. Repudiating the former “general acceptance” standard, the Daubert Court held that the Federal Rules of Evidence control the admissibility of expert scientific evidence in federal 19eourt. Finding that the Louisiana Code of Evidence was modeled after the Federal Rules of Evidence, our Supreme Court adopted the- requirements set forth in Daubert. See Foret, 628 So.2d at 1122.
*775 The general, rule governing the admissibility of expert testimony in Louisiana courts is found in La. C.E. art. 702. “A witness, who is qualified as an expert by knowledge, .skill, experience, training, or education may testify in the form of an opinion or otherwise if” four conditions are satisfied. Ibid, (emphasis added). The first, and critical, but not pertinent to the issue before us, is that “[t]he expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.” La. C.E. art. 702(1); see State v. Farrier, 14-0623, p. 7 (La.App. 4 Cir. 3/25/15), 162 So.3d 1233, 1239 . (“By explicitly finding that the opinion testimor ny of Dr. McAuliff would only serve to confuse the jury, the trial judge answered the critical question that this testimony would not be helpful and excluded the testimony.”) The other three conditions are pertinent to a Daubert-Foret inquiry-conducted by the trial judge qua gatekeeper: “[La. C.E. art. 702]- (2) The testimony is based on sufficient facts or data; (3) The testimony is the product of reliable principles and methods; and (4) The expert has reliably applied- the principles and methods to the facts of the case.” In civil proceedings, the Daubert-Foret pretrial hearing is one “to determine whether a witness qualifies as an expert or whether the methodologies employed by such witness are reliable under Articles 702 through 705 of the Louisiana Code of Evidence.” La. C.C.P. art. 1425 F(l). And, notably, the party | mdemanding such a'pretrial hearing and determination of the reliability of evidence which the opposing party intends to introduce into evidence at the trial “shall set
forth sufficient allegations showing the necessity for these determinations by the court.” Ibid, (emphasis added). Upon a timely filed ánd sufficiently alleged motion for a Daubert-Foret hearing, the court “shall” hold a contradictory hearing. La. C.C.P. art. 1425 F(2).[2] “At the hearing, the court shall consider the qualifications and methodologies of the proposed witness based upon the provisions of Articles 104(A) and 702 through 705 of the Louisiana Code of Evidence.” Ibid;
Thus, in exercising her gatekeep-ing function, a trial judge must make a “preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue.” Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786. Importantly, if the gatekeep-ing role is not. properly executed, there is a risk that the expert evidence may be prejudicial or misleading; trial judges must therefore employ “a careful evaluation of the methodology surrounding the testimony and its conclusions.” Foret, 628 So.2d at 1122.
As noted above, DNA evidence is deemed relevant to a criminal prosecution. As to the reliability of the evidence, pertinent factors for the trial In court to consider include: (1) The “testability” of the scientific theory or technique; (2) Whether the theory or.technique has been subjected to peer review and publication; (3) The known or potential rate of error; and (4) Whether the methodology is generally accepted in the scientific community. See Daubert, 509 U.S. at 594-95, 113 S.Ct. *776 2786;- see also State v. Quatrevingt, 93-1644, p. 11 (La.2/28/96), 670 So.2d 197, 204.[3]
B
It is well-established that the trial court is afforded wide discretion in determining whether expert testimony should be admitted and who should or should not be qualified as an expert. See General Elec. Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (the standard of review for a trial court’s ruling on whether to admit or exclude expert testimony under Daubert is abuse of discretion); see also Cheairs v. State ex rel. Dep’t of Transp. And Dev., 03-0680, p. 6 (La.12/3/03), 861 So.2d 536, 541.
Although the Code of Criminal Procedure is silent on the issue, Louisiana jurisprudence suggests that it is also within a trial court’s discretion whether or not to hold a Daubert-Foret hearing when determining reliability. See State v. Chauvin, 02-1188, p. 18 (La.5/20/03), 846 So.2d 697, 709 (“The trial court in its discretion can determine, on a case by case basis, if a [Daubert ] hearing is necessary ... to test the reliability of expert testimony.”); but see State v. Lee, 14-2374, p. 7 (La.9/18/15), 181 So.3d 631, 637 (suggesting in l12connection with DNA evidence that a trial judge is required to perform its ga-tekeeping function). See also Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir.2014) (“While pretrial ‘Daubert hearings’ are commonly used ... they are certainly not required.”) (citing cases).[4]
Despite this broad discretion, only upon a scientific method’s proven “inherent reliability” may a trial court forgo a Daubert-Foret hearing, as it allows the judge to take judicial notice of the accuracy of the scientific testimony. See Foret, 628 So.2d at 1123, n. 8; see also State v. Quatrevingt, 617 So.2d 484, 490, n. 11 (La.App. 4 Cir.1992).
IV
In this Part, we discuss the formidable impact DNA evidence has in a criminal case and why when there are sufficient allegations of its potential unreliability it is essential for a pretrial determination of the challenged DNA evidence’s reliability before a ruling on its admissibility.
A
There is, as we earlier indicated, no doubt of the consensus that, generally and ordinarily, DNA evidence is sufficiently reliable to cross the admissibility threshold. See Quatrevingt, 93-1644, p. 12, 670 So.2d at 204. DNA evidence has been critical in obtaining convictions in criminal prosecutions. See, e.g., State v. Danastasio, 12-1157, p. 9 (La.App. 4 Cir. 1/30/14), 133 So.3d 224, 230 (DNA ^evidence, as sole evidence of defendant’s guilt, found sufficient and reliable); Dist. Attorney’s Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 62, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009) (With the use of DNA testing, “[i]t is now often possible to determine whether a biological tissue matches a suspect with near certainty.”). Likewise, DNA evidence has been and will continue to be instrumental in exonerating those wrongly convicted. See Osborne, 557 U.S. at 98, *777 129 S.Ct. 2308 (Stevens, J., dissenting) (“DNA evidence has led to an extraordinary series of exonerations, not only in cases where the trial evidence was weak, but also in cases where the convicted parties confessed then’ guilt and where the trial evidence against them appeared overwhelming.”); see also Williams J. Morgan, Jr., Justice in Foresight: The Past Problems With Eyeioitness Identification and Exoneration By DNA Technology, 3 S. Regional Black L. Students Ass’n L.J. 60 (2009); Julie H. Kilborn, Convicted But Innocent: Why Postr-Conviction Lawyers Are Indispensible, 57 La. B.J. 314 (2010) (discussing exonerations by DNA evidence in Louisiana and elsewhere).
But no science is immune to new advances in the field; indeed, some scientific theories widely accepted in the past have since been discredited and are no longer admissible. See, e.g., Maryland v. Kulbicki, 577 U.S.-,-, 136 S.Ct. 2, 3-4, — L.Ed.2d-,-(per curiam) (Comparative Bullet Lead Analysis was presented by state’s expert at trial; 11 years after conviction CBLA was no longer generally accepted by the scientific community and therefore inadmissible). See also Brandon L. Garrett, Peter J, Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L.Rev. 1, 5 (2009) (“scientific advances led to [the 114inmate’s] exoneration, but invalid forensic science testimony had also supported his conviction.”).
Moreover, although DNA evidence is relevant and generally reliable, there are still a number of problems inherent in DNA collection and analysis, especially in criminal cases: the samples are often contaminated with other material from the crime scene; a particular sample may be insufficient to conduct a proper test or to repeat the test at a later date; and it is difficult to obtain a clean, full sample from an unknown suspect. See Quatrevingt, 617 So.2d at 498. Private laboratories, often contracted by the state to perform DNA analysis, can also present issues regarding the transparency of their methods and procedures. See id. at 499. See also Osborne, 557 U.S. at 80-84, 129 S.Ct. 2308 (Alito, J., concurring) (discussing dangers of laboratory contamination and evidence tampering that may reduce reliability of DNA results). The “crucible of cross-examination,” without more, may therefore be insufficient for challenging this type of scientific evidence, primarily because the errors associated with DNA testing “rarely surface in a smoking-gun-in~this-forensic-report kind of way.” See Erin Murphy, The Mismatch Between Twenty-First-Century Forensic Evidence and Our Antiquated Criminal Justice System, 87 S. Cal. L.Rev. 633, 658 (2014) (“Scandal after scandal has surfaced in newspapers and investigative reports, detailing an astonishing array of interpretive errors, sample switches, and acts of overt malfeasance with regard to forensic analysis”).
I tfiB
In light of the unique and powerfully persuasive aspect of DNA evidence, the trial judge’s gatekeeping obligation to ensure that the scientific evidence is not only relevant but, more importantly for our purposes here, also reliable, cannot be understated. A Dauberb-Foret hearing is appropriate when a defendant raises sufficient issues concerning not the conclusions generated by the testing, but the methodologies utilized to obtain those conclusions. See Doe v. Archdiocese of New Orleans, 01-0739, p. 5 (La.App. 4 Cir. 5/8/02), 823 So.2d 360, 364 (internal citation omitted). See also Daubert, 509 U.S. at 595, 113 S.Ct. 2786 (“The focus ... must be solely on principles and methodology, not on the conclusions that they generate.”).
*778 Here, Mr. Hampton’s primary argument,'.see Part II, ante, rests on the allegation that Reliagene utilized out-of-date procedures to analyze “mixed” DNA samples which .generated “partial”. DNA profiles. In assessing the sufficiency of his allegation, we too rely in-part on “published literature on the subject matter.”, See Foret, 628 So.2d at 1131. The Scientific Working Group on DNA Analysis Methods (SWGDAM), a group of approximately 50 scientists representing federal, state, and local forensic DNA laboratories in the United States and Canada which meets biannually, published revised guidelines in 2010 which were included by the Federal Bureau, of Investigation in its compilation of publications relating to CODIS (the Combined DNA Index System). See SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories, https://www.fbi.gov/ about-us/lab/biometric-analysis/codis/ swgdam-interpretation-lisguidelines. SWGDAM defines a mixed sample as one that contains DNA from two or more individuals, which of course is to be expected in a rape investigation. A partial profile, however, is “a DNA profile for which typing results are not obtained at all tested loci due, for example, to DNA degradation, inhibition of amplification and/or low— quantity template.”[5] Although neither Mr. Hampton nor the prosecution has provided conclusive proof of the dates that the tests in this case were conducted, the SWGDAM guidelines issued in 2010 reveal that the science behind DNA evidence is constantly evolving, and that methods and procedures should be updated in tandem. And, of course, we do not suggest that merely because developments in the science of DNA may have established “more reliable” testing procedures that “less reliable” testing procedures are by that fact alone rendered “unreliable” and thus inadmissible. But, it remains important to point out |17that Daubert-Foret hearings were actually held by the trial courts in all the Louisiana cases cited by the prosecution in support of its argument that DNA testing is or continues to be inherently reliable. See State v. Draughn, 05-1825, *779 p. 14 (La.1/17/07), 950 So.2d 588, 596; State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, 908; Quatrevingi supra, 93-1644, pp. 7-8, 670 So.2d at 202.
We find that, because of the age of some of the samples, the testing procedures used at the time of their collection,' and the apparent emerging scientific developments which may cast doubt upon the reliability of those procedures, -Mr. Hampton has made allegations about the unreliability of some of the proposed DNA evidence which suffice to trigger the neees-. sity of holding an appropriate pretrial contradictory hearing before determining that such evidence will be admitted at trial. We point out that Mr. Hampton had no evidentiary burden to bear at the pleading or motion stage and that the trial judge’s imposition of such a burden upon him (“[t]he Defense has failed to offer any evidence to support a finding that the testing performed in any way deviated from the standard practice or was in some.way unreliable”) is an erroneous application of law such that the trial judge abused her discretion. See State v. Franklin, 13-1489, p, 12 (La.App. 4 Cir. 6/11/14), 147 So.3d 231, 240 (“A trial court necessarily abuses its discretion if its ruling is based on an erroneous view or application of the law.”). In this regard, we emphasize that here it is the prosecution, as the proponent of the challenged DNA evidence, which bears the burden of establishing to the trial judge’s satisfaction at the Daubert-Foret hearing that the evidence is reliable. See State v. Charles, 617 So.2d 895, 896 (La.1993) (“This court’s previous opinions make clear that the burden of proving the admissibility of [DNA] evidence is on the party moving to introduce such evidence.”).
In light of the sufficiency of the allegations of Mr. Hampton’s motion coupled with the apparently critical and perhaps even indispensable importance of this proposed DNA evidence as the evidence of identifying of Mr. Hampton as the perpetrator in a prosecution of this gravity (the potential for four life-without-parole sentences), we conclude that the trial judge did not have the choice to refuse to conduct an appropriate pretrial hearing on the reliability of the limited DNA evidence which Mr, Hampton challenges.
REMAND INSTRUCTIONS
We remand this matter to the trial court with instructions to the judge to conduct an appropriate pretrial hearing on the reliability and admissibility of the challenged, older DNA evidence at which hearing the trial judge shall consider the qualifications and methodologies of any proposed witness based upon the provisions of Articles 104(A) and 702 through 705 of the Louisiana Code of Evidence. At the hearing, the burden of establishing reliability shall be upon the proponent of the evidence.
CONCLUSION
The trial judge abused her discretion in denying the defendant’s motion for. a Dau-bertr-Foret pretrial hearing. Accordingly, we reverse the trial judge’s ruling h3denying Mr. Hampton’s motion and remand with instructions for an appropriate hearing on the reliability of the DNA evidence in this ease.
WRIT GRANTED; REVERSED; REMANDED; STAY LIFTED

. It appears in the record that Mr. Hampton had been previously incarcerated in 1997 on a six-year sentence for simple burglary.

. It appears that all that is required for “sufficient allegations” under La. C.E. art. 1425 F are those which challenge the expert’s methodology as unreliable and allege that the expert testimony does not satisfy the requirements set forth in Daubert and Foret, See, e.g., Robertson v. Doug Ashy Bldg. Materials, Inc., 10-1552, pp. 26-30 (La.App, 1 Cir. 10/4/11), 77 So.3d 339, 357-60; Arceneaux v. Shaw Group, Inc., 12-0135, p. 4 (La.App. 1 Cir. 9/24/12), 103 So.3d 1086, 1089.

. The Daubert factors apply not only to scientific testimony, but to all expert testimony. See Kurriho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

. Despite its statement that Daubert hearings are not required, the Ninth Circuit found that the trial court abused its discretion in failing to hold the hearing. See Estate of Barabin, 740 F.3d at 464.

. See also Donald E. Riley, DNA Testing: An Introduction for Non-Scientists, An Illustrated Explanation (2005), http://wWw.scientific.org/ tutorials/articles/riley/riley.html (excerpt):
Use of "partial profiles” is a newly emerging and fairly disturbing trend. A partial profile is one in which not all of the loci targeted show up in the sample. For example, if 13 loci were targeted, and only 9 could be reported, that would be termed, a partial profile. Failure of all targeted loci to show up demonstrates a serious deficiency in the sample. Normally, all human cells (except red blood cells and cells called "platelets”) have all 13 loci. Therefore, a partial profile represents the equivalent of less than a single human cell. This presents some important problems:
1. A partial profile essentially proves that one is operating outside of well-characterized and recommended limits.
2. Contaminating DNA usually presents as a partial profile, although not always. For this reason, the risk that the result is a contaminant is greater than for samples that present as full profiles.
3.A partial profile is at risk of being incomplete and misleading, The partial nature of it proves that DNA molecules have been missed, There is no way of firmly determining what the complete profile would have been, except by seeking other samples that may present a full profile,
Most forensic laboratories will tiy to obtain full profiles. Unfortunately, in an important case, it may be tempting to use a partial profile, especially if that is all that one has. However, such profiles should be viewed skeptically. Over-interpretation of partial profiles can probably lead to serious mistakes. Such mistakes could include false inclusions and false exclusions, alike. It could be said that, compared to the first PCR-based tests introduced into the courts, use of partial profiles represents a decline in standards.